**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **JEFF SMITH,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 3:22-cv-00096** |
| | : | |
| **v.** | : | **Judge Michael J. Newman** |
| | : | |
| **CITY OF UNION, OHIO** | : | **Magistrate Judge Peter B. Silvain Jr.** |
| | : | |
| **Defendant.** | : | |

---

### DEFENDANT CITY OF UNION, OHIO'S MOTION FOR SUMMARY JUDGMENT

---

Now comes Defendant, City of Union, Ohio (hereinafter "Defendant" and "the City"), by and through counsel, and hereby moves this Honorable Court pursuant to Rule 56 of the Federal Rules of Civil Procedure for judgment in its favor, as there is no genuine issue as to any material fact, and Defendant is entitled to judgment as a matter of law on each of Plaintiff's claims. This motion is fully supported in the accompanying memorandum and by the evidence submitted herewith.

Respectfully submitted,

*/s/ Benjamin J. Reeb*
Beverly A. Meyer, Trial Counsel (0063807)
Arthur P. Schoulties, Co-Counsel (0086900)
Benjamin J. Reeb, Co-Counsel (100018)
BRICKER GRAYDON LLP
312 N. Patterson Blvd., Suite 200
Dayton, Ohio 45402
Telephone: 937.224.5300
Facsimile: 937.224.5301
E-mail: bmeyer@brickergraydon.com
aschoulties@brickergraydon.com
breeb@brickergraydon.com
*Attorneys for Defendant*

18927383v3

**COMBINED TABLE OF CONTENTS AND SUMMARY OF ARGUMENT**

I.      INTRODUCTION……………………………………………………………..1

II.     STATEMENT OF FACTS……………………………………………………….2

III.    LAW AND ARGUMENT……………………………………………………...11

A.      Standard of Review…………………………………………………………………11

B.      Plaintiff's Age Discrimination Claim Fails as a Matter of Law…………………………..12

Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to the compensation, terms, conditions, or privileges of employment, because of such individual's age." *See* 29 U.S.C. § 623(a)(1). Under Ohio law, it is unlawful for any employer, because of age, to discharge without cause or otherwise discriminate against a person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment. Ohio Rev. Code 4112.02(A). Under either federal or state law, the burden of persuasion remains on plaintiffs to prove by a preponderance of the evidence "that age was the 'but-for' cause of their employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009). "This requires showing that age was the determinative reason they were terminated; that is, a plaintiff must show 'that age was the "reason" that the employer decided to act.'" *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 323 (6th Cir. 2021). A plaintiff can only survive a motion for summary judgment by presenting direct evidence of discrimination or circumstantial evidence from which a jury may infer a discriminatory motive. *Id.*

1.      Plaintiff cannot present direct evidence of age discrimination……………………………13

"Direct evidence is evidence which, if believed, would require the conclusion that age was the but-for cause of the employment decision." *Pearo v. Hansen & Adkins Auto Transport, Inc.*, 2015 WL 1469163, at *2 (S.D. Ohio Mar. 30, 2015) (citing *Bartlett v. Gates*, 421 Fed.Appx. 485, 488-89 (6th Cir. 2010)). Specifically, it is "'evidence of conduct or statements by persons involved in making the employment decision directly manifesting a discriminatory attitude, of a sufficient quantum and gravity that would allow the factfinder to conclude that attitude more likely than not was a motivating factor in the employment decision.'" *Scott v. Potter*, 182 Fed.Appx. 521, 525-26 (6th Cir. 2006) (quoting *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 724 (8th Cir. 2001)). "'Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age,' satisfy these criteria." *Id.* at 526 (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)).

Plaintiff has not identified a single age-related discriminatory statement or remark that could constitute sufficient direct evidence under the law in support of his discrimination claims.

i

Consequently, Plaintiff must establish a prima facie case of age discrimination using circumstantial evidence, which he cannot do.

2.   Plaintiff cannot present sufficient circumstantial evidence of age discrimination………..15

Indirect or circumstantial evidence is "proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). To establish a prima facie case of age discrimination for an adverse employment action using circumstantial evidence, a Plaintiff must show that "(1) he is a member of the protected class, that is, he is at least forty years of age; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) he was treated differently from similarly situated employees outside the protected class." *Mitchell v. Vanderbilt University*, 389 F.3d 177, 181 (6th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

Here, Plaintiff cannot establish he was treated differently from similarly situated employees outside of the protected class. Plaintiff contends Greg Redmon, Michael Hoover, Jason Jacobs, Mark Charles and Justin Brown are similarly situated employees who were treated differently than him. However, as a matter of law, none of the aforementioned employees engaged in the same misconduct as Plaintiff. Additionally, as a matter of law, none of the aforementioned employees were treated more favorably than Plaintiff. Accordingly, Plaintiff cannot establish a prima facie case of age discrimination using circumstantial evidence.

3.   Defendant had legitimate nondiscriminatory reasons for its actions……………………...21

If a plaintiff is able to establish his prima facie case, the burden-shifting framework from the seminal *McDonnell Douglas* case is then utilized. *Kohmescher v. Kroger Co.*, 61 Ohio St.3d 501, 503-04 (1991). Under that framework, the employer may produce a legitimate, nondiscriminatory reason for its action, and in turn, the plaintiff can attempt to prove that the proffered reason is instead a pretext for discrimination. *Id.* The burden on the employer here is merely one of production, not persuasion. See *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (quoting Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248 (1981)). When specifically alleging disparate treatment age discrimination, the plaintiff must show that age "actually motivated the employer's decision," meaning that a plaintiff must show that age actually motivated and had a determinative influence on the employer's action. *Id.* at 141. In this context, a plaintiff must show that the employer acted with affirmative intent to discriminate. *Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009). Here, Plaintiff must prove that, *but for his age*, he never would have been terminated. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) (emphasis added).

Here, Defendant terminated Plaintiff for a series of unacceptable mistakes over a two-day period and not for any reason related to his age. Plaintiff violated numerous department policies that caused significant danger to himself, his fellow officers, and members of the community at large. Plaintiff's age was not *the reason* for Defendant's actions, nor was it even a factor.

C. Plaintiff's Retaliation Claim Fails as a Matter of Law…………………………………24

To establish a prima facie case of retaliation, a plaintiff must show "'(1) that [he] engaged in a protected activity; (2) that the defendant had knowledge of [his] protected conduct; (3) that the defendant took an adverse employment action towards [him]; and (4) that there was a causal connection between the protected activity and the adverse employment action.'" *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008) (quoting *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 381 (6th Cir. 2002)). In its analysis, a court must determine whether retaliation is the "but-for" cause of the adverse actions a plaintiff alleges against a defendant. *Goodsite v. Norfolk Southern Ry. Co.*, 573 Fed.Appx. 572, 582 (6th Cir. 2014).

1. Plaintiff cannot establish any adverse action was taken against him………………………24

"The Sixth Circuit defines an adverse employment action as a 'materially adverse change in the terms or conditions of [one's] employment.'" *Hodges v. City of Milford*, 918 F.Supp.2d 721, 735 (S.D. Ohio 2013) (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)). An adverse action is only material if it "would 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" *Blizzard v. Marion Technical College*, 698 F.3d 275, 290 (6th Cir. 2012) (quoting *Lahar v. Oakland Cnty.*, 304 Fed.Appx. 354, 357 (6th Cir. 2008). "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Lahar* at 357 (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)).

Plaintiff alleges a number of actions purportedly taken by Defendant, none of which could constitute an adverse employment action. As argued herein, and as a matter of law, none of Defendant's actions, even if assumed to be true, are of a nature to suffice as an adverse employment action under relevant law.

2. Plaintiff also cannot establish the necessary causal link……………………………………...33

Additionally, the fourth element of a retaliation claim—the causal element—looks to whether retaliation is the "but-for" cause of the adverse actions. *Goodsite v. Norfolk Southern Ry. Co.*, 573 Fed.Appx. 572, 582 (6th Cir. 2014). Here, Plaintiff is unable to establish that any of Defendant's allegedly retaliatory conduct is related to his Charge of Discrimination, as is required by relevant law. Again, Plaintiff's age was not *the reason* for Defendant's actions, nor was it even a factor.

3. Defendant had legitimate nonretaliatory purposes for its actions…………………..…34

As with age discrimination claims, if a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to "'offer a nondiscriminatory reason for the adverse employment action.'" *Blizzard v. Marion Technical College*, 698 F.3d 275, 288 (6th Cir. 2012) (quoting *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009)). If this burden is met by the defendant, the plaintiff then has the burden to demonstrate that the proffered reason was mere pretext. *Id*. The burden of persuasion remains with the plaintiff throughout, even while the burden of production shifts between the parties. *Ladd* at 502 (citing *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)).

Here, Defendant's actions (including but not limited to, requiring a fitness for duty exam, hiring lieutenants with supervisor experience, providing raises pursuant to the collective bargaining agreement, issuing non-disciplinary Employee Performance Improvement Plans ("EPIPs" or "EPIP"), requiring mandatory training, and providing a nondiscriminatory and objective performance evaluation) all had a legitimate, nondiscriminatory animus.

IV.     CONCLUSION……………………………………………………………………..38

CERTIFICATE OF SERVICE…………...……………………………………………………....39

iv

<u>**MEMORANDUM IN SUPPORT**</u>

**I.**    <u>**INTRODUCTION**</u>

On January 8, 2021 Jeff Smith (hereinafter "Plaintiff") filed a Charge of Discrimination against the City of Union Police Department with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC"), alleging age discrimination under the Age Discrimination in Employment Act ("ADEA") and Ohio law. (Second Amended Complaint, Doc. 50, PageID 186). The OCRC subsequently issued its Determination finding no probable cause that Defendant engaged in an unlawful discriminatory practice pursuant to Ohio Rev. Code § 4112.02. (*Id.*, at PageID 187). The EEOC adopted the OCRC's decision finding no probable cause of discrimination and issued a Dismissal and Notice of Right to Sue. (*Id.*) Plaintiff then filed suit against the City of Union Police Department on April 12, 2022 alleging age discrimination based on wrongful termination under the ADEA, 29 U.S.C. § 623 et. seq., and Ohio Rev. Code § 4112.02. (Complaint, Doc. 1). Defendant timely filed its Answer to Plaintiff's Complaint on June 8, 2022. (Answer, Doc. 7).

Plaintiff filed a second Charge of Discrimination against the City of Union Police Department with the OCRC and EEOC on May 16, 2022, alleging retaliation under the ADEA and Ohio law. (Second Amended Complaint, Doc. 50, PageID 190). After requesting to withdraw his second charge from the OCRC and EEOC, Plaintiff was issued a Notice of Right to Sue on his Second Charge. (*Id.*). Plaintiff then sought leave to file an amended complaint, which was granted by this Court, and on October 28, 2022, Plaintiff filed his Amended Complaint. (Amended Complaint, Doc. 20). Plaintiff's Amended Complaint contains the same two claims as his original complaint, with the addition of a third claim – retaliation under the ADEA and Ohio Rev. Code §

1

4112.02. (*Id.*). Defendant timely filed its Answer to Plaintiff's Amended Complaint on November 10, 2022. (Answer to Amended Complaint, Doc. 21).

On November 15, 2022, the City of Union Police Department filed a Motion for Judgment on the Pleadings, arguing solely that it, as a City Police Department, is not *sui juris*. (Defendant's Motion for Judgment on the Pleadings, Doc. 22). Plaintiff responded by filing a Memorandum in Opposition (Plaintiff's Memorandum in Opposition, Doc. 25) as well as a Motion for Leave to File Second Amended Complaint (Plaintiff's Motion for Leave, Docs. 26 and 27). This Court granted Plaintiff leave to file a Second Amended Complaint on July 13, 2023. (Order, Doc. 49). That same day, Plaintiff filed his Second Amended Complaint (Second Amended Complaint, Doc. 50), with the only difference from his initial Amended Complaint being that he named the City of Union, Ohio (hereinafter "Defendant") as Defendant rather than the City of Union Police Department. Defendant timely filed its Answer to Plaintiff's Second Amended Complaint on July 18, 2023. (Answer to Second Amended Complaint, Doc. 51).

As explained herein, Plaintiff's claims for age discrimination and retaliation under both federal and state law are wholly unsubstantiated and must fail as a matter of law.

## II.  <u>STATEMENT OF FACTS</u>

Plaintiff Jeff Smith is a police officer employed by the City of Union. (Second Amended Complaint, Doc. 50, PageID 183-84). He began his employment with Defendant City of Union in February 2003. (*Id.*; Exhibit A, Affidavit of Michael J. Blackwell, ¶ 3[1]). He has been a full-time police officer with the City since March of 2003. (Plaintiff Dep. 85:2-9; Blackwell Aff., ¶ 3). Plaintiff was recommended for hire by his lifelong friend, Chief Mike Blackwell. (Exhibit B,

---

[1] The Affidavit of Michael J. Blackwell, attached hereto as Exhibit A, is hereinafter referred to as "Blackwell Aff."

2

Affidavit of Kathy S. Wysong, Ex. 1, Blackwell 284-85[2]; Blackwell Aff., ¶ 3) Throughout the duration of Plaintiff's employment at the City of Union, he has been covered by collective bargaining agreements dictating the terms and conditions of his employment (Plaintiff Dep. 80-81; Plaintiff Dep., Exs. 10 Previous CBA, 11 Current CBA).

Over the course of his employment, Plaintiff received extensive and repeated training on a vast number of law enforcement topics, including trainings on vehicle pursuits, automobile searches, dealing with job stress, DNA evidence collection and identification, advanced crime scene investigation, report writing, and operation of mobile audio, video and camera systems. (Plaintiff Dep., Ex. 1 Smith Training Certificates). Between October 1, 2019 and May 30, 2020, Plaintiff received specific, repeated trainings on when to initiate and terminate vehicle pursuits, medical aid and response, and search and seizure along with further trainings on how to notify dispatch of traffic collisions, safety restraints, personal protective equipment, discriminatory harassment, and investigation and prosecution. (*Id.*). Plaintiff has also been a certified evidence technician since 2004. (*Id.*; Plaintiff Dep. 13:21-24). It is undisputed that Plaintiff is the most trained police officer employed by the City of Union. (Arb. Tr., Vol. 2, Blackwell 301:19-23; Blackwell Aff., ¶ 4). Despite his extensive training and experience, Plaintiff made a number of policing errors and exercised poor judgment in a series of events occurring on May 30 and 31,

---

[2] Arbitration proceedings were held on January 20 and February 9, 2021 regarding the City of Union's termination of Plaintiff. Kathy S. Wysong was the arbitration court reporter during these proceedings. The Affidavit of Kathy S. Wysong is attached hereto as Exhibit B. Volumes 1 and 2 of the Arbitration Transcript are marked Exhibits 1 and 2, respectively, to that Affidavit. References to "Arb. Tr." herein refer to this certified Arbitration Transcript. Full citations to this Transcript will appear as follows: "Arb. Tr., [Vol. 1 or 2], [Witness Name] [Transcript Page Number]."

2020. Nearly all of these errors are captured on body cam video of Plaintiff and Officer Greg Redmon[3] and in a series of photographs taken on scene,[4] all of which are submitted herewith.

On May 30, 2020, Plaintiff was dispatched to 3318 Phillipsburg Union Road following a report of a suspicious unoccupied vehicle parked behind the Union Methodist Church located at 222 Shaw Road. (Arb. Tr., Vol. 1, Redmon 233; Blackwell Aff., Ex. 1 Incident Report No. 20-042647). Plaintiff entered the church parking lot to investigate, and the suspicious vehicle began moving and ultimately turned onto Phillipsburg Union Road. (Arb. Tr., Vol. I, Redmon, 238-39; Blackwell Aff., Ex. 1 Incident Report No. 20-042647). Plaintiff pursued the vehicle, despite his acknowledgement that he had witnessed no clear evidence of a crime. (Arb. Tr., Vol. 2, Smith 593; Smith Cam. 13:31:10-13:31:14[5]; Redmon Cam. 13:31:10-13:31:14).[6] Another City of Union Police Officer, Officer Greg Redmon added himself to the call to assist Plaintiff, and he arrived at the church prior to Plaintiff. (Arb. Tr., Vol. 1, Redmon 233, 236; Plaintiff Dep. 47:1-3; Blackwell Aff., Ex. 1 Incident Report No. 20-042647). Officer Redmon did not participate in the pursuit along with Plaintiff because he recognized the pursuit as invalid. (Arb. Tr., Vol. 1, Redmon 240; Plaintiff Dep. 61:18-22; Redmon Dep. 30:11-20). Instead, Officer Redmon trailed behind Plaintiff and the suspect vehicle during Plaintiff's pursuit of the vehicle. (Redmon Dep. 12:7-14).

---

[3] Defendant filed a Motion for Leave to Submit Video Summary Judgment Exhibits. Those videos include Jeff Smith's body cam footage (Blackwell Aff., Ex. 3 – hereinafter denoted "Smith Cam."); Greg Redmon's body cam footage (Blackwell Aff., Ex. 2 – hereinafter denoted "Redmon Cam."); a predisciplinary administrative interview of Plaintiff conducted by Captain Chris Allen (Blackwell Aff., Ex. 5 – hereinafter denoted "Admin. Inter. Cam."); and street camera footage (Blackwell Aff., Ex. 4 – hereinafter denoted "Street Cam. Footage"). Those videos are authenticated by Chief Blackwell, (Blackwell Aff., ¶¶ 6-8), and were provided to Plaintiff during discovery.

[4] Photographs taken on the scene are attached as Exhibit 6 to Chief Blackwell's Affidavit.

[5] Military times denoted in citations to Smith Cam., Redmon Cam., and Admin. Inter. Cam. are from the counters appearing in the top right corner of the screen.

[6] Plaintiff can be heard telling Officer Redmon "I don't know why she [i.e., the driver] took off."

4

During the pursuit, where Plaintiff exceeded speeds of 75 miles per hour, the driver of the vehicle repeatedly engaged in behaviors that created hazards to the public safety, including passing a slower moving vehicle on the right-hand side, swerving sharply to avoid a parked car, speeding past a city park at approximately 75 miles per hour in a 35 mile per hour zone, and running a red light. (Arb. Tr., Vol. 2, Smith 594-98; Blackwell Aff., Ex. 1 Incident Report No. 20-042647). Plaintiff did not terminate his pursuit despite these hazards. (Arb. Tr., Vol. 2, Smith 596-98). Moreover, Plaintiff was not wearing his seatbelt during the pursuit, as is evidenced by the audible vehicle seatbelt reminder and Plaintiff's own admission. (Smith Cam. 13:25:47-13:25:54; Arb. Tr., Vol. 2, Smith 471). The pursuit ended when the driver of the vehicle Plaintiff was pursuing crashed headfirst into a retaining wall at a high rate of speed. (Blackwell Aff., Ex. 4 Street Cam. Footage 00:20-00:45; Arb. Tr., Vol. 2, Smith 596:3-16,).[7]

Following the driver's crash, Plaintiff failed to follow basic police protocols. Plaintiff notified dispatch upon arrival at the crash scene to "start a medic," but failed to provide the location where Emergency Medical Services ("EMS") were needed. (Smith Cam. 13:26:13; Arb. Tr., Vol. 1, Allen 70). The driver and Plaintiff exited their vehicles in the intersection, and the driver told him that her friend was in the house near the church they had just left. (Smith Cam. 13:26:00). Rather than inquiring about her statement to determine whether additional dangers existed, Plaintiff ignored this information. (*Id.*; Arb. Tr., Vol. 1, Allen 70, 76). Seconds later, the driver collapsed backward, striking her head on her car. (Smith Cam. 13:26:08). Rather than approaching the victim to assist her, Plaintiff asked for a medic over his radio, even though he had still not

---

[7] Video of the pursuit from Plaintiff's cruiser is unavailable because he failed to turn on his in-car camera that day. The only video of the entire pursuit is from Plaintiff's body camera.

notified dispatch of his location so they would know where these emergency services were required. (Smith Cam. 13:26:13; Arb. Tr., Vol. 1, Allen 70).

Plaintiff failed to render any aid to the victim or otherwise address her needs for the next ninety-seven seconds. (Smith Cam. 13:26:08-13:27:45). In Plaintiff's own words, he "just left her laying where she was at." (Arb. Tr., Vol. 2, Smith 495). Instead of addressing any medical needs of the victim, he examined the damage to the front of her car and called in its license plate, all while ignoring dispatch's continued attempts to ascertain his location. (Smith Cam. 13:26:08-13:27:45; Arb. Tr., Vol. 1, Allen 71). When Plaintiff finally did address the driver, he referred to her as "Honey" and "Sweetheart." (Smith Cam. 13:29:26). As Plaintiff spoke with the driver, she repeatedly reached under the car and around the bottom of the driver's seat. (Smith Cam. 13:29:53). Plaintiff should have handcuffed the driver at that time. (Arb. Tr., Vol. 1, Allen 75). However, he failed to do so, and he also failed to pat her down or otherwise check for weapons, even though other medical and fire personnel were en route to the scene, thereby creating a danger for himself and all emergency personnel who would report to the scene. (Arb. Tr., Vol. 1, Allen 59, 75; Arb. Tr., Vol. 2, Smith 502). Plaintiff would also later write in his Incident Report that "mild smoke was coming from the engine compartment" of the car. (Blackwell Aff., Ex. 1 Incident Report No. 20-042647). Despite his observation of this additional risk to everyone involved, Plaintiff did not attempt to move the driver or secure the scene in any other fashion. (Smith Cam. 13:26:08-13:27:45).

Plaintiff had more training than any other officer on the City's police force, but Plaintiff's deficiencies still did not end after medical assistance arrived. (Blackwell Aff., ¶ 4). After donning a pair of gloves and examining the inside of the car, Plaintiff found a scale of the sort often used to weigh drugs. (Smith Cam. 13:35:12; Arb. Tr., Vol. 1, Allen 78). He did not take this scale in for

6

evidence. (Arb. Tr., Vol. 1, Allen 180). During further examination, a bag of what Plaintiff initially identified as methamphetamine fell out of the sun visor of the victim's car. (Smith Cam. 13:39:30; Redmon Cam. 13:39:30). Plaintiff did collect this as evidence. After picking up this bag with suspected drugs again—and all without changing his gloves—Plaintiff handled other items in the car, made a call on his personal cell phone, handled items in his own cruiser, and opened and drank from a bottled sports drink. (Smith Cam. 13:39:33-13:54:03). When Plaintiff finally took off this pair of contaminated gloves, he tossed them into the driver's side door of his cruiser instead of properly disposing of them in an evidence bag or other secure container. (Smith Cam. 13:58:13; Arb. Tr., Vol. 1, Allen 90-91). He then left the scene of the crash to go to the hospital where the victim had been transported by ambulance, again failing to fasten his seatbelt as he drove to the hospital. (Smith Cam. 13:58:55; Arb. Tr., Vol. 1, Allen 92).

Later than same day, Plaintiff returned to the church at 222 Shaw Road to take photographs. (Arb. Tr., Vol. 1, Allen 104; Blackwell Aff., Ex. 6 Photographs). After taking nine photos of a glove that was directly next to the initial position of the victim's car, Plaintiff inexplicably chose not to take the glove into evidence, leaving it lying on the grass where he saw it. (*Id.*).

The next day, on May 31, 2020, the City's Police Department received a report of a suspected breaking and entering at a house directly next to the church at 222 Shaw Road. (Arb. Tr., Vol. 1, Allen 105-06). Plaintiff and another City of Union police officer, Officer Michael Hoover were sent to investigate the scene. (*Id.*).  Officer Hoover was a less experienced police officer who was hired by the City on January 4, 2018.  (Blackwell Aff., ¶ 11). Importantly, Plaintiff was the only certified evidence technician on the scene. (Plaintiff Dep. 50:2-10; Blackwell Aff., ¶ 11). During his investigation, Plaintiff took photographs of three criminal tools: a large pair of bolt cutters, a small pair of bolt cutters, and a pipe cutter. (Blackwell Aff., Ex. 6 Photographs). Despite

7

recognizing all three as criminal tools and knowing they did not belong to the homeowner, Plaintiff only took one pair of bolt cutters to submit into evidence. (Admin. Inter. Cam. 15:01:32; Arb. Tr., Vol. 1, Allen 115). When City officers returned again to the scene on June 1, they found that the other criminal tools had been removed from the scene by an unknown individual before the Police Department could secure them. (Arb. Tr., Vol. 1, Allen 218). This felony breaking and entering case remains unsolved, due in part to the absence of DNA touch evidence that Plaintiff failed to collect on May 31, 2020. (Arb. Tr., Vol. 1, Allen 116-17, 139, 218). Also, although the driver of the car Plaintiff pursued on May 30, 2020 was initially charged with a number of offenses resulting from her actions that day, all charges had to be dropped because of Plaintiff's ineptness. (Arb. Tr., Vol. 2, Blackwell 317).

On June 4, 2020, Defendant notified Plaintiff of its administrative investigation into his above-referenced conduct. (Second Amended Complaint, Doc. 50, PageID 185). City of Union Police Captain Christopher Allen conducted the investigation, and based on that investigation, he identified violations of numerous sections of the City of Union Police Department Policy Manual in his Administrative Investigation Report. (Administrative Investigation Report located at Plaintiff Dep., Ex. 4 and Blackwell Aff., Ex. 8).[8] Plaintiff was subsequently placed on a paid administrative leave on June 11, 2020. (Second Amended Complaint, Doc. 50, PageID 185). A predisciplinary hearing was held on July 8, 2020, in accordance with the requirements of the collective bargaining agreement, and thereafter, Defendant terminated Plaintiff's employment on

---

[8] In Captain Allen's Administrative Investigation Report, he determined that Plaintiff violated the following policies from the Department Policy Manual: 307.3.1: When to Initiate a Pursuit; 1008.2: Wearing of Safety Restraints; 319.5.7 Causes for Discipline – Efficiency; 423.3: First Responding Member Responsibilities; 319.5.8: Causes for Discipline – Conduct; 1005.4.1: Exposure Prevention and Mitigation – General Precautions; 800.3: Evidence/Property Handling; 414.4.1: Activation of the MVR – Required Activation of the MVR.

August 3, 2020. (*Id.*). In the City's August 3, 2020 Disciplinary Action letter to Plaintiff, it identified the following bases for his termination:

- Improper and unjustified initiation and continuation of pursuit;

- Failure to fasten seatbelt both during the pursuit and afterwards en route to the hospital;

- Failure to hear statements made by the driver related to a second suspect or accomplice at the house where a breaking and entering would be reported the next day;

- Failure to render aid to the driver for over ninety seconds;

- Failure to check for weapons at any point;

- Failure to give dispatch his location;

- Use of inappropriate terms with the driver; failure to activate his in-car camera; and

- Evidence collection issues, including:

  - Continuing to use a glove that came into contact with methamphetamine and a drug scale;

  - Attempting to shift blame to another officer despite being the evidence technician present at the scene;

  - Failure to submit a glove found at the scene into evidence despite taking nine photographs of it; and

  - Failure to collect all of the criminal tools at the scene.

(Disciplinary Action Letter located at Plaintiff Dep., Ex. 5 and Blackwell Aff., Ex. 9).

Thereafter, the Ohio Patrolmen's Benevolent Association ("OPBA") grieved Plaintiff's termination through arbitration, pursuant to the collective bargaining agreement between the OPBA and the City. (Second Amended Complaint, Doc. 50, PageID 185-86). On January 20 and February 9, 2021, an arbitration hearing concerning Plaintiff's termination was held before the

9

Arbitrator. (*Id.*, PageID 186). On June 8, 2021, the Arbitrator issued an Opinion and Award in which he determined the City had just cause to discipline Plaintiff but reinstated Plaintiff's employment by Defendant while imposing an unpaid three-day suspension in lieu of termination. (*Id.*; Blackwell Aff., ¶ 16).

Defendant thereafter notified Plaintiff that he was scheduled to attend a fitness for duty examination to determine Plaintiff's ability to return to work. (Blackwell Aff., Ex. 10 Fitness for Duty Examination Letter). Defendant scheduled this examination for Plaintiff because of repeated statements he made during his June 9, 2020 Administrative Interview that he was "stressed" when he engaged in his conduct occurring on May 30, 2020 and that the policing errors he made on that day were the result of this stress. (Plaintiff Dep. 79:2-7; Admin. Inter. Cam.). Defendant subjects its police officers to fitness for duty examinations any time it has objective reasons to question an officer's ability to perform his or her duties in a manner that protects the safety of the officer and the safety of the public at large. (Blackwell Aff., ¶ 14). Plaintiff attended his scheduled fitness for duty examination and was cleared to return to work, and Plaintiff began working again as a City of Union police officer on August 16, 2021. (Plaintiff Dep. 110:16-19; Blackwell Aff., ¶ 16). Defendant promptly provided all backpay to Plaintiff between the time of his termination and his August 16, 2021 return to duty, with the exception of the three-day unpaid suspension ordered by the Arbitrator. (Blackwell Aff., ¶ 16). Plaintiff acknowledged that this payment compensated him in full for this backpay between the time he was terminated and the time he was reinstated. (Plaintiff Dep. 163:3-7).

18927383v3

## III.    LAW AND ARGUMENT

### A.  Standard of Review

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a moving party has met its initial burden of informing the Court of the basis for its motion, the burden shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323, (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, (1986) (quoting Fed. R. Civ. P. 56(e)).

Summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322; *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588, (1986). In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Anderson*, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "show that there is some metaphysical doubt as to the material facts." *Id.* (quoting *Matsushita*, 475 U.S. at 586). The nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *LePage v. Bd. of Trustees of Thorn Twp.*, No. 2:03-CV-0062, 2005 WL 3274873, at *2 (S.D. Ohio Dec. 2, 2005) (citing *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)).

11

Notably, in reviewing a defendant's motion for summary judgment under the ADEA, a court may properly turn to standards applicable to claims for discrimination and retaliation under Title VII caselaw to the extent they are not preempted by those standards specifically applicable to the ADEA. *See Morgan v. Washington Mfg. Co.*, 660 F.2d 710, 712 (6th Cir.1981).[9] For that reason, Defendant relies on precedent arising under both the ADEA and Title VII in demonstrating that it is entitled to judgment as a matter of law on each of Plaintiff's claims.

### B. Plaintiff's Age Discrimination Claim Fails as a Matter of Law.

Plaintiff has brought age discrimination claims under the ADEA, 29 U.S.C. § 623, and also under Ohio law pursuant to Ohio Rev. Code § 4112.02. Here, however, Defendant will address those claims together since an "age discrimination claim brought under Ohio law is analyzed under the same standards applicable to . . . federal claims asserted pursuant to the ADEA." *Moore v. AMPAC*, 645 Fed.Appx. 495, 497-98 (6th Cir. 2016) (citing *Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir. 2005)).

The ADEA provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to the compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff's burden in "[m]eeting this 'because of' requirement is no simple task." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 323 (6th Cir. 2021). The Supreme Court has emphasized that, under the ADEA, the burden of persuasion remains on plaintiffs to prove by a preponderance of the evidence "that age was the 'but-for' cause of their employer's adverse

---

[9] "(B)ecause Title VII shares with ADEA a common purpose, i.e., elimination of discrimination in the workplace, because the statutory schemes are similar, and because both statutes require an almost identical filing with the appropriate agency within 180 days after the alleged discriminatory act," the two statutes should be construed uniformly where possible and the cases under one statute "have value as precedent for cases arising under the other." 660 F.2d at 712.

action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009). "This requires showing that age was the determinative reason they were terminated; that is, they must show 'that age was *the "reason"* that the employer decided to act.'" *Pelcha*, 988 F.3d at 324 (quoting *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir. 2014)) (emphasis added). A plaintiff can only survive a motion for summary judgment by presenting direct evidence of discrimination or circumstantial evidence from which a jury may infer a discriminatory motive. *Id.* No such evidence exists in this matter.

> **1. Plaintiff cannot identify any statements or remarks that could constitute direct evidence of age discrimination.**

"Direct evidence is evidence which, if believed, would require the conclusion that age was the but-for cause of the employment decision." *Pearo v. Hansen & Adkins Auto Transport, Inc.*, 2015 WL 1469163, at *2 (S.D. Ohio Mar. 30, 2015) (citing *Bartlett v. Gates*, 421 Fed.Appx. 485, 488-89 (6th Cir. 2010)). Specifically, it is "'evidence of conduct or statements by persons involved in making the employment decision directly manifesting a discriminatory attitude, of a sufficient quantum and gravity that would allow the factfinder to conclude that attitude more likely than not was a motivating factor in the employment decision.'" *Scott v. Potter*, 182 Fed.Appx. 521, 525-26 (6th Cir. 2006) (quoting *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 724 (8th Cir. 2001)). "'Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age,' satisfy these criteria." *Id.* at 526 (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)).

Plaintiff has not identified a single discriminatory statement or remark related to his age that constitutes direct evidence under the law in support of his discrimination claims. Instead, Plaintiff's Complaint alleges that during a pre-disciplinary meeting held on July 8, 2020, Plaintiff's supervisor, Chief Michael Blackwell, stated that he watched videos of younger patrol officers and

13

they did not make the same mistakes as Plaintiff. (Second Amended Complaint, Doc. 50, PageID 185). However, the evidence shows that Chief Blackwell's alleged statement, made after routine daily reviews of videos of officer pursuits across the entire country, had nothing to do with Plaintiff's age, but instead contemplated issues concerning Plaintiff's high level of training and experience in combination with the severity and seriousness of Plaintiff's mistakes. (Blackwell Dep. 33:14-20). Relative to the statement, Chief Blackwell made clear that when he said "younger, [he] meant lesser experienced officer" and that it was his belief that a "lesser experienced officer would have done better" than Plaintiff under the circumstances. (*Id.* at 31:12-32:1).

This alleged comment is, at best, a stray, isolated comment that Plaintiff self-servingly attempts to take out of context for his own benefit. One isolated, mischaracterized comment such as this is not enough to satisfy Plaintiff's burden under the legal standards applicable to his claims. The Sixth Circuit has made clear that "merely vague, ambiguous, or isolated remarks" cannot constitute sufficient direct evidence of age-inspired employment discrimination to create a jury question. *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330–31 (6th Cir.1994).

Further, there is no allegation that City Manager John Applegate uttered any comment referencing Plaintiff's age. Under Defendant's policies and Charter, it is the City Manager, and not the Chief of Police, who makes disciplinary decisions. (Arb. Tr., Vol. 2, Applegate 425:9-13; Arb. Tr., Vol. 2, Blackwell 283:13-22). John Applegate, and not Chief Michael Blackwell, made the decision to terminate Plaintiff's employment. (Arb. Tr., Vol. 2, Applegate 426-427). Therefore, Chief Blackwell's comment concerning younger, less experienced officers, conveniently mischaracterized by Plaintiff in this action, is insufficient to support his age discrimination claim.

Plaintiff cannot identify any statement or remark that could constitute direct evidence of discrimination because none exist. Consequently, in order to meet his burden, Plaintiff must

14

establish a prima facie case of age discrimination using circumstantial evidence which, as explained below, Plaintiff cannot do.

### 2. Plaintiff cannot establish a prima facie case of age discrimination using circumstantial evidence either.

Indirect or circumstantial evidence is "proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). To establish a prima facie case of age discrimination for an adverse employment action using circumstantial evidence, a Plaintiff must show that "(1) he is a member of the protected class, that is, he is at least forty years of age; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) he was treated differently from similarly situated employees outside the protected class." *Mitchell v. Vanderbilt University*, 389 F.3d 177, 181 (6th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

Here, Plaintiff contends he was terminated as a result of his age. (Second Amended Complaint, Doc. 50, PageID 185, 188). However, Plaintiff cannot establish the fourth element of his prima facie case—i.e., that he was treated differently from similarly situated employees outside the protected class. "The fourth element may be satisfied 'by showing that similarly situated non-protected employees were treated more favorably.'" *Malloy v. Potter*, 266 Fed.Appx. 424, 427 (6th Cir. 2008) (quoting *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995)). However, "[t]o be deemed 'similarly situated' in the disciplinary context, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and have *engaged in the same conduct* without such *differentiating or mitigating circumstances* that would distinguish their conduct or the employer's

15

treatment of them for it.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). (emphasis added).

Plaintiff contends Greg Redmon, Michael Hoover, Jason Jacobs, Mark Charles, and Justin Brown are similarly situated employees who were treated differently than him. (Second Amended Complaint, Doc. 50, PageID 185; Plaintiff Dep., Ex. 9, Plaintiff's Supp. Discovery Responses, Interrogatory 11). However, and as explained below, the evidence shows that none of these individuals was similarly situated to Plaintiff or treated more favorably.

### *Officer Greg Redmon*

Plaintiff contends Officer Greg Redmon "was not disciplined for same or similar mistakes as Plaintiff regarding the events of May 30-31, 2020." (Plaintiff Dep., Ex. 9, Plaintiff's Supp. Discovery Responses, Interrogatory 10). Although Officer Redmon joined the dispatched call on May 30, 2020, he did not engage in the same misconduct as Plaintiff. On that date, Plaintiff was dispatched to 3318 Phillipsburg Union Road based upon a report of a suspicious unoccupied vehicle parked behind the church located at 222 Shaw Road. (Arb. Tr., Vol. 1, Redmon 233; Blackwell Aff., Ex. 1 Incident Report No. 20-042647). Officer Redmon added himself to the call and arrived at the church prior to Plaintiff. After Plaintiff entered the church parking lot, the vehicle began moving and turned onto Phillipsburg Union Road. Plaintiff, and not Officer Redmon, pursued the vehicle. Plaintiff witnessed no clear evidence of a crime before initiating his pursuit, confirming the same when he told Officer Redmon affirmatively, and unequivocally, "I don't know why she took off." (Smith Cam. 13:31:10-13:31:14; Redmon Cam. 13:31:10-13:31:14). Officer Redmon did not participate in the pursuit along with Plaintiff because he recognized it as invalid. (Arb. Tr., Vol. 1, Redmon 240:8-21). Instead, Officer Redmon trailed behind Plaintiff and the suspect vehicle during the pursuit and had nothing to do with the occurrence of the resulting

16

crash. These distinctions preclude Officer Redmon and Plaintiff from being deemed similarly situated.

During the pursuit, the driver and Plaintiff repeatedly engaged in behaviors that created hazards to the public safety, with the driver's actions including passing a slower moving vehicle on the right-hand side, swerving sharply to avoid a parked car, speeding past a busy city park at approximately 75 miles per hour in a 35 mile per hour zone, and running a red light. (Arb. Tr., Vol. 2, Smith 594:4-597:25). At no time did Plaintiff terminate his pursuit, despite these recognized hazards. (Arb. Tr., Vol. 2, Smith 598:1-598:6). During the pursuit Plaintiff was also not wearing his seatbelt, as is evidenced by the audible vehicle seatbelt reminder and Plaintiff's own admission. (Smith Cam. 13:25:47-13:25:54; Arb. Tr., Vol. 2, Smith 471:1-4). The pursuit ended when the driver of the vehicle Plaintiff was pursuing crashed headfirst into a retaining wall. (Arb. Tr., Vol. 2, Smith 596:3-16; Blackwell Aff., Ex. 4 Street Cam. Footage 00:20-00:45). Plaintiff notified dispatch upon arrival of the crash scene to "start a medic," but failed to notify dispatch of the location where EMS were needed. (Smith Cam. 13:26:13). Thus began Plaintiff's series of policing errors that resulted in his justified discipline. *See supra* at pp. 4-8.

Plaintiff's actions during and after the pursuit were his own. Officer Redmon's actions relative to the pursuit and its aftermath were vastly different and objectively distinguishable from those of Plaintiff. As one example, Officer Redmon can be seen changing his gloves multiple times on his bodycam video. (Redmon Cam. 13:42:51, 13:50:38, 13:53:48, 13:57:16, 13:59:27). Additionally, Officer Redmon was not on the scene, nor involved in any way, in the May 31 breaking and entering incident, which Plaintiff readily acknowledged. (Plaintiff Dep. 46:9-21). To that end, and as a matter of law, Officer Redmon did not engage in the same conduct as Plaintiff.

17

Accordingly, Plaintiff cannot establish sufficient circumstantial evidence as it relates to Officer Redmon.

### *Officer Michael Hoover*

Plaintiff also contends that Officer Michael Hoover "was not disciplined for same or similar mistakes as Plaintiff regarding the events of May 30-31, 2020." (Plaintiff Dep., Ex. 9, Plaintiff's Supp. Discovery Responses, Interrogatory 11). Officer Hoover, however, was not involved in any way in Plaintiff's May 30, 2020 pursuit incident. Officer Hoover was present on the scene of the breaking and entering investigation on May 31, 2020, along with Plaintiff. (Plaintiff Dep. 49:22-50:1). However, unlike Plaintiff, Officer Hoover was not a trained evidence technician. (*Id.* at 50:2-10). As the only trained evidence technician on the scene that day, it was Plaintiff's, and not Officer Hoover's, responsibility to process the scene, including taking in physical evidence for inventory and testing. Plaintiff failed to do this. Plaintiff was disciplined because he failed to collect and preserve evidence at the scene and it was his responsibility to do so.

Importantly, Plaintiff was disciplined for the May 31, 2020 investigation *and* the May 30, 2020 pursuit, which Officer Hoover was not a part of, and throughout which Plaintiff committed numerous policy violations, all as previously discussed. The differences in certifications and job duties between Plaintiff and Officer Hoover, as well as the fact that Plaintiff's discipline was the result of conduct on both May 30, 2020 *and* May 31, 2020, constitute differentiating circumstances that establish Officer Hoover and Plaintiff were not similarly situated. Accordingly, Plaintiff cannot establish sufficient circumstantial evidence as it relates to Officer Hoover.

### *Lieutenant Jason Jacobs*

Plaintiff also contends that Lieutenant Jason Jacobs was treated more favorably in that he was "rehired as [l]ieutenant, although he had less training and experience than Plaintiff" while Plaintiff was not promoted to lieutenant. (Plaintiff Dep., Ex. 9, Plaintiff's Supp. Discovery Responses, Interrogatory 11). However, Plaintiff cannot demonstrate that he was similarly situated to Lieutenant Jacobs. Prior to being hired as a lieutenant at the City of Union, Lieutenant Jacobs was a Captain in the City of Brookville Police Department. (Blackwell Dep. 58:6-12, 59:1-4). Thus, Lieutenant Jacobs was not similarly situated to Plaintiff not only due to the fact that he was hired from an external police department but also because he had significant supervisory experience that Plaintiff was lacking. Plaintiff himself acknowledged he was unknowledgeable as to Lieutenant Jacobs' complete background and supervisory experience prior to him being hired as a lieutenant. (Plaintiff Dep. 68:12-69:11). Accordingly, Plaintiff was not similarly situated with Lieutenant Jacobs and, as a result, cannot establish sufficient circumstantial evidence as it relates to Lieutenant Jacobs.

### *Lieutenant Mark Charles*

Plaintiff similarly contends that Lieutenant Mark Charles was treated more favorably than Plaintiff in that he was "rehired as [l]ieutenant, although he had less training and experience than Plaintiff." (Plaintiff Dep., Ex. 9, Plaintiff's Supp. Discovery Responses, Interrogatory 11). However, Plaintiff cannot demonstrate that he was similarly situated to Lieutenant Charles either. Prior to being hired as a lieutenant at the City of Union, Lieutenant Charles was a Corporal, with supervisory responsibilities, in the Village of Yellow Springs Police Department. (Blackwell Dep. 70:18-24). Thus, Lieutenant Charles, like Lieutenant Jacobs, was not similarly situated to Plaintiff not only due to the fact that he was hired from an external police department, but also because he had significant supervisory experience that Plaintiff was lacking. Plaintiff himself acknowledged

19

he was unknowledgeable as to Lieutenant Charles' background and supervisory experience prior to him being hired as a lieutenant. (Plaintiff Dep. 70:20-71:13). Accordingly, Plaintiff was not similarly situated with Lieutenant Charles and, as a result, cannot establish sufficient circumstantial evidence as it relates to Lieutenant Charles.

### Officer Justin Brown

Plaintiff's contention that Officer Justin Brown was treated differently than him is solely rooted in his mistaken belief that Officer Brown was permitted to skip a mandatory training that Plaintiff was required to attend. (Second Amended Complaint, Doc. 50, PageID 190; Plaintiff Dep. 71). Specifically, in his Complaint, Plaintiff asserted that "[o]n or about October 6, 2021, Mr. Smith was ordered to return back from a vacation leave due to mandatory training, even though a younger officer was permitted to miss the mandatory training while he was on vacation." (Second Amended Complaint, Doc. 50, PageID 190). Plaintiff confirmed during his deposition that Officer Brown was the officer he was referring to. (Plaintiff Dep. 101:1-11). Contrary to Plaintiff's mistaken belief, Officer Brown was disciplined for missing the training and received a written reprimand for his misconduct. (Blackwell Aff., Ex. 11 Justin Brown Letter of Reprimand). In other words, Officer Brown was expected to attend the mandatory training, just as Plaintiff and every other officer was, and was disciplined accordingly for his absence. Thus, Officer Brown was not treated more favorably than Plaintiff. Further, Plaintiff was not disciplined. Accordingly, Plaintiff cannot establish sufficient circumstantial evidence as it relates to Officer Brown.

In sum, Plaintiff cannot sufficiently establish the required direct or circumstantial evidence from which a jury may infer a discriminatory motive. In turn, Plaintiff has failed to establish a prima facie case for age discrimination and, accordingly, his claim must be dismissed as a matter of law.

20

18927383v3

**3. Even if Plaintiff could establish a prima facie case of age discrimination, which he cannot, Defendant had legitimate nondiscriminatory reasons for its actions that were not pretext for discrimination.**

If a plaintiff is able to establish his prima facie case, the burden-shifting framework from the seminal *McDonnell Douglas* case is then utilized. *Kohmescher v. Kroger Co.*, 61 Ohio St.3d 501, 503-04 (1991). Under that framework, the employer may produce a legitimate, nondiscriminatory reason for its action, and in turn, the plaintiff can attempt to prove that the proffered reason is instead a pretext for discrimination. *Id.* The burden on the employer here is merely one of production, not persuasion. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (quoting Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248 (1981)). When specifically alleging disparate treatment age discrimination, the plaintiff must show that age "actually motivated the employer's decision," meaning that a plaintiff must show that age actually motivated and had a determinative influence on the employer's action. *Id.* at 141. In this context, a plaintiff must show that the employer acted with affirmative intent to discriminate. *Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009). Here, Plaintiff must prove that, *but for his age*, he never would have been terminated. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) (emphasis added).

Plaintiff was terminated because he engaged in a series of unacceptable mistakes over a two-day period—as presented in greater detail above—and not for any reason related to his age. (*See* Disciplinary Action Letter located at Plaintiff Dep., Ex. 5 and Blackwell Aff., Ex. 9). On May 30, 2020, Plaintiff initiated and continued an unjustified pursuit, failed to fasten his seatbelt, failed to hear the driver make clear statements about another suspect/accomplice, failed to notify dispatch of the location where EMS services were needed, failed to render aid to the driver and referred to her using patronizing and derogatory terms, failed to check her for weapons, mishandled evidence,

21

failed to activate his in-car camera, and failed to change his contaminated gloves. (Arb. Tr., Vol. 2, Smith 460, 471, 484, 495, 498, 502, 524, 547, 559). These mistakes caused significant danger to everyone involved. (Arb. Tr., Vol. 1, Allen 69; Arb. Tr., Vol. 2, Blackwell 347, 349). His actions also potentially exposed Defendant to major financial liability. (Arb. Tr., Vol. 2, Applegate 430-31). Although the driver was initially charged with a number of offenses, all charges were subsequently dropped due to Plaintiff's misconduct. (Arb. Tr., Vol. 2, Blackwell 317). Plaintiff also failed to properly collect evidence at the related breaking and entering the next day on May 31, 2020, causing the case to remain unsolved. (Arb. Tr., Vol. 1, Allen 116, 139). Given Plaintiff's extensive experience and training, Plaintiff's mistakes become even more concerning for his and the safety of others, thereby making them unacceptable. In aggregate, the aforementioned misconduct constitutes Defendant's legitimate, nondiscriminatory reason for terminating Plaintiff.

Defendant's actions, as detailed herein, were reasonable, legitimate, and nondiscriminatory and otherwise supported by Plaintiff's conduct. The Sixth Circuit has repeatedly recognized that courts afford great flexibility to employers when making personnel decisions, specifically explaining "[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. Rather, employers may not hire, fire, or promote for impermissible, discriminatory reasons. *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir.1996). To that end, this Court should not second guess Defendant's reasons for its actions relative to Plaintiff. Instead, pursuant to governing law, this Court is limited to determining whether Plaintiff's age was **the reason** for Defendant's actions. Age was clearly not **the reason**, nor was it even a factor in Defendant's actions.

Further, Plaintiff cannot show Defendant's proffered reasons for termination were pretext for age discrimination. To succeed in this regard, Plaintiff must produce persuasive evidence that

the employer's proffered reason: (1) had no basis in fact; (2) did not actually motivate its decision; or (3) was insufficient to warrant the decision. *Ladd v. Grand Trunk W.R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009).

First, Plaintiff cannot advance such an argument because he has affirmatively admitted to *all* of his misconduct except for the unjustified pursuit. (Arb. Tr., Vol. 2, Smith 460, 471, 484, 495, 498, 502, 524, 547, 559). Even without that single admission, Captain Allen and Chief Blackwell both testified that Plaintiff's pursuit was unacceptable given the circumstances. (Arb. Tr., Vol. 1, Allen 80; Arb. Tr., Vol. 2, Blackwell 310-11). Second, Chief Blackwell performed a comprehensive review of Plaintiff's personnel record as well as documents related to the investigation into the May 2020 events, and he recommended termination to City Manager John Applegate on that basis. (Arb. Tr., Vol. 2, Blackwell 341). Mr. Applegate agreed with the recommendation, citing the liability to Defendant and Plaintiff's inability to perform basic actions required of a public servant as the reasons for Plaintiff's termination. (Arb. Tr., Vol. 2, Applegate 432-33). Plaintiff can produce no evidence to dispute these motivations. Third, and as mentioned several times herein, Plaintiff's actions endangered himself and the public, caused crimes to go unsolved and unanswered, and exposed Defendant to significant financial liability. To argue these actions are insufficient to warrant the decision to terminate Plaintiff is to argue that police departments must accept unnecessary danger to themselves and the public, accept unsolved crimes due to unacceptable procedural mistakes, and accept unnecessary financial exposure to the City; such risk cannot possibly be acceptable for police departments. Plaintiff's actions were unquestionably sufficient to warrant Defendant's decision. For these reasons, Plaintiff cannot prove that Defendant's proffered reasons for termination were pretext for age discrimination.

23

### C. Plaintiff's Retaliation Claim Fails as a Matter of Law.

To establish a prima facie case of retaliation, a plaintiff must show "'(1) that [he] engaged in a protected activity; (2) that the defendant had knowledge of [his] protected conduct; (3) that the defendant took an adverse employment action towards [him]; and (4) that there was a causal connection between the protected activity and the adverse employment action.'" *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008) (quoting *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 381 (6th Cir. 2002)). In its analysis, as with Plaintiff's age discrimination claims above, a court must determine whether retaliation is the "but-for" cause of the adverse actions a plaintiff alleges against a defendant. *Goodsite v. Norfolk Southern Ry. Co.*, 573 Fed.Appx. 572, 582 (6th Cir. 2014).

Here, Plaintiff contends he was retaliated against for "initiating, filing and pursuing his age discrimination charges related to his termination from employment." (Second Amended Complaint, Doc. 50, PageID 189). However, Plaintiff cannot establish a prima facie case of retaliation, as he cannot point to any adverse employment action, let alone an adverse employment action causally connected to the filing of his discrimination charges.

### 1. Plaintiff cannot establish any adverse action was taken against him.

"The Sixth Circuit defines an adverse employment action as a 'materially adverse change in the terms or conditions of [one's] employment.'" *Hodges v. City of Milford*, 918 F.Supp.2d 721, 735 (S.D. Ohio 2013) (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)). An adverse action is only material if it "would 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" *Blizzard v. Marion Technical College*, 698 F.3d 275, 290 (6th Cir. 2012) (quoting *Lahar v. Oakland Cnty.*, 304 Fed.Appx. 354, 357 (6th Cir. 2008). "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not create such

18927383v3

deterrence." *Lahar* at 357 (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). Plaintiff alleges a number of actions purportedly taken by Defendant, none of which could constitute an adverse employment action.

Specifically, Plaintiff alleges that: (1) he was subject to a fitness for duty examination upon his return to work; (2) Defendant promoted Greg Redmon to Lieutenant, hired Jason Jacobs and Mark Charles as Lieutenants, and offered a Lieutenant position to Ken Becker; (3) he did not receive the raises he wanted as a result of collective bargaining; (4) he received several non-disciplinary Employee Performance Improvement Plans ("EPIPs" or "EPIP"); (5) he was required to attend a mandatory training on October 6, 2021; (6) he received a yearly evaluation in December 2021 which he claims to be adverse; (7) Captain Chris Allen purportedly made certain adverse comments to him; (8) Chief Blackwell required Plaintiff to acknowledge certain department policies; and (9) he was faced with questions from community members regarding why he was terminated. (Second Amended Complaint, Doc. 50, PageID 189-90; Plaintiff Dep., Ex. 9, Plaintiff's Supp. Discovery Responses, Interrogatory 14). Notwithstanding the fact that some of these alleged actions cannot be substantiated by Plaintiff, none of the alleged actions constitute adverse employment actions that materially and adversely change the terms or conditions of Plaintiff's employment.

*Fitness for Duty Examination*

The requirement that Plaintiff submit to a fitness for duty examination prior to returning to work clearly does not constitute an adverse employment action. The Sixth Circuit has held that "employers may 'requir[e] mental and physical exams as a precondition to returning to work,'" and as such, "'an examination ordered for valid reasons can neither count as an adverse job action nor prove discrimination.'" *Pena v. City of Flushing*, 651 Fed.Appx. 415, 422 (6th Cir. 2016)

(quoting *Sullivan v. River Valley School Dist.*, 197 F.3d 804, 812-13 (6th Cir. 1999)). Moreover, the collective bargaining agreement covering Plaintiff's employment specifically provides "if the City has reasonable cause to believe an employee is mentally or physically unable to perform required duties, the City may require the employee to take an examination to determine physical or mental capacity to perform required duties." (Plaintiff Dep., Exs. 10 Previous CBA, 11 Current CBA; Plaintiff Dep. 80-81).

Here, the fitness for duty examination was unequivocally conducted for valid reasons. Specifically, during the administrative interview pertaining to Plaintiff's conduct and policy violations during the May 30-31, 2020 incidents, Plaintiff repeatedly indicated his conduct was the result of stress. (Plaintiff Dep. 79:2-7; Admin. Inter. Cam.). Plaintiff acknowledged this during his deposition. (Plaintiff Dep. 79:2-7). Further, from the time Plaintiff was placed on administrative leave in June 2020 to the time he returned to work in August, 2021, Plaintiff had not performed any police work *whatsoever*. (Plaintiff Dep. 79:8-13). Thus, the fitness for duty examination was required to ensure that it was safe, both for Plaintiff and the community at large, to return Plaintiff to his position as a patrol officer. (Blackwell Dep. 53; Applegate Dep. 22). Furthermore, other officers at the City have been required to submit to a fitness for duty examination when there has been a question as to whether they were able to perform the duties of the police officer job. (Blackwell Aff., ¶ 14).

<u>Promotion and Hiring Decisions</u>

Second, the promotion of Greg Redmon to lieutenant, hiring of Jason Jacobs and Mark Charles as lieutenants, and offer of a lieutenant position to Ken Becker cannot, in any way, be construed as an adverse employment action relative to Plaintiff. For some time, the City has known that it was necessary to hire and/or promote lieutenants so that there were supervisors available on

most all of the shifts. (Applegate Dep. 24:2-18; Blackwell Dep. 59:22-25, 60:1-3). For instance, Chief Blackwell had been pursuing the hiring of additional supervisor positions for several years, and Captain Allen additionally expressed a need for greater supervisor capacity across the various shifts. (Blackwell Dep. 59:22-24; Allen Dep. 46:1-9). As such, the City promoted and/or hired based on a need it previously identified and selected candidates who it deemed most qualified. Regarding the promotion of Greg Redmon to Lieutenant, Chief Blackwell made the decision to recommend Officer Redmon for promotion based upon his merit. (Blackwell Dep. 56:22-25). Further, Officer Redmon had taken on additional duties within the department and expressed a strong interest in being promoted in a conversation with Chief Blackwell months prior. (Redmon Dep. 18-19). As for the hiring of Jason Jacobs and Mark Charles, both had significant supervisory experience in other police departments. Naturally, this would be an important factor in Defendant's promotion and hiring decisions considering it was looking to fill lieutenant positions, a supervisory role. Prior to being hired as a lieutenant by Defendant, Mark Charles was a corporal, with supervisory responsibilities, in the Village of Yellow Springs Police Department. (Blackwell Dep. 70:18-24). Likewise, prior to being hired as a lieutenant by Defendant, Jason Jacobs had supervisory responsibilities as a captain in the City of Brookville Police Department. (Blackwell Dep. 58:6-12, 59:1-4). Finally, although Ken Becker ultimately declined the City's employment offer, Defendant considered him for a lieutenant position in large part due to his supervisory experience as a sergeant with Five Rivers Metro Parks. (Allen Dep. 74:22-25).

The promotion of these individuals (and the offer to Ken Becker) is, in no way, an adverse employment action to Plaintiff, as it in no way affected the terms or conditions of his employment. Moreover, Plaintiff never expressed any legitimate interest in being promoted to anyone. Plaintiff testified that, other than a brief conversation between himself and Chief Blackwell around the time

27

that Plaintiff started with the department in 2003 regarding possible advancement in the future, Plaintiff has never expressed an interest or desire in being promoted to any supervisor, at any point in time. (Plaintiff Dep. 83:14-25, 84:18-22). Moreover, Plaintiff has been employed by the City for twenty years and has consistently demonstrated poor judgment in basic police processes throughout that time including, but certainly not limited to, the incidents on May 30-31, 2020. (*See, e.g.*, Plaintiff Dep. Exs. 2 Prior Discipline and EPIPs, 3 OHLEG Suspension). One such incident, in 2014, involved Plaintiff's use of Ohio Law Enforcement Gateway ("OHLEG") to obtain personally identifiable information on an individual for his own personal purposes. (Plaintiff Dep., Ex. 3 OHLEG Suspension; Plaintiff Dep. 18). Plaintiff acknowledges that this conduct was improper use of OHLEG, further acknowledging that it could have resulted in him being charged with a felony pursuant to Ohio Rev. Code § 2913.04 if it had been pursued by Defendant. (Plaintiff Dep. 20:5-7, 13-16). Instead, Defendant disciplined him with a five-day suspension. (Plaintiff Dep. 21:2-5). Thus, the City would have every reason not to promote Plaintiff, even if he had requested the promotion, which he did not. His work record demonstrates he is not qualified to supervise the City's police officers or function as a police lieutenant.

*Pay Raises Pursuant to the Collective Bargaining Agreement*

Third, the amount in raises that Plaintiff received during the term of, and pursuant to, the collective bargaining agreement cannot constitute an adverse employment action. Wages are negotiated between the bargaining unit, to which Plaintiff is a member, and the City; they are not unilaterally imposed on department employees by Defendant. (Ohio Rev. Code Chapter 4117; Plaintiff Dep., Ex. 11 Current CBA). In other words, it was the bargaining unit, not Defendant, that ultimately voted to ratify the wage increases of employees in the collective bargaining agreement. (*Id.*). Moreover, Plaintiff admits he did in fact receive raises in 2021, 2022, and 2023.

28

18927383v3

(Plaintiff Dep. 92). Further, as is common practice in collective bargaining agreements, the collective bargaining agreement here categorizes members based upon date of hire into separate groups or brackets, which are then used to determine the percentage raise that each group is to receive. (Plaintiff Dep., Ex. 11 Current CBA). Plaintiff admits he received the raise he was entitled to based upon his corresponding date of hire. (Plaintiff Dep. 92-93). Thus, Plaintiff's percentage raise was determined the same way as all other bargaining unit members—namely, based upon an objective date of hire wage bracket. More importantly, however, and as previously indicated, the entire collective bargaining agreement, including its wage provisions, was bargained for and ratified by the bargaining unit. Accordingly, Plaintiff cannot establish the raises he received were even the result of an action of the Defendant, let alone an adverse action of the Defendant.

### *Non-disciplinary Employee Performance Improvement Plans*

Fourth, Plaintiff's receipt of several *non-disciplinary* EPIPs does not constitute an adverse action. Plaintiff received several EPIPs due to performance issues after his return to work (i.e., after filing his OCRC and EEOC charges). However, EPIPs are non-disciplinary in the City of Union Police Department. (Allen Dep. 14:7-15; Plaintiff Dep. 151:1-3). Plaintiff expressly acknowledged both that EPIPs are non-disciplinary and that he has not received any discipline since filing his OCRC and EEOC charges. (Plaintiff Dep. 151:1-13). Plaintiff received an EPIP on September 4, 2021, for failing to show up to work on time for his scheduled shift. (Plaintiff Dep., Ex. 12 (9/4/21 EPIP)). On October 20, 2021, Plaintiff was issued an EPIP for failing to properly investigate and document suspicious activity that a community member reported to Plaintiff concerning a possible child abduction attempt. (Plaintiff Dep., Ex. 13 (10/20/21 EPIP)). The EPIP was issued because Plaintiff failed to document the incident as required by Section 321.2.2 of the General Order Manuel. (*Id.*). On March 29, 2022, Plaintiff was issued an EPIP for backing his

29

cruiser into a table, which resulted in minor damage to both the cruiser and the table. (Plaintiff Dep., Ex. 14 (3/29/22 EPIP)). On November 28, 2022, Plaintiff was issued an EPIP for failing to show up to work on time for his scheduled shift. (Plaintiff Dep., Ex. 15 (11/28/22 EPIP)). On March 27, 2023, Plaintiff was issued an EPIP for failing to timely follow up on a reported rape. (Plaintiff Dep., Ex. 16 (3/27/23 EPIP)). Specifically, Plaintiff failed to timely complete and serve a search warrant that was required to obtain DNA evidence that was obtained from the sexual assault kit. (*Id.*). On July 4, 2023, Plaintiff was issued another EPIP in relation to the same rape case for failure to timely retrieve online lab results from the (OHLEG) BCI site in order to do a follow up narrative to submit to the Montgomery County Prosecutor's office for review. (Plaintiff Dep., Ex. 17 (7/4/23 EPIP)).[10]

Despite Plaintiff's conduct that served as the basis for the abovementioned EPIPs, some more serious than others, Defendant decided to only issue *non-disciplinary* EPIPs to Plaintiff in lieu of discipline. Defendant's conduct belies Plaintiff's allegations of retaliation in every instance. Defendant's decision to encourage improvement in Plaintiff's performance through non-disciplinary measures clearly does not adversely affect the terms or conditions of his employment, especially in light of the alternate option—piling up disciplinary actions on his record.

*Mandatory Training*

Fifth, Defendant's requirement that Plaintiff attend a mandatory training does not constitute an adverse employment action and, as previously explained, Plaintiff's contention that Officer Justin Brown was permitted to skip the training is not even true. (Blackwell Aff., Ex. 11

---

[10] Plaintiff verified all of the EPIPs included as Exhibits 12-17 in his Deposition. (See Plaintiff Dep. 145-150).

Justin Brown Letter of Reprimand).[11] Plaintiff cannot logically argue that Defendant's requirement that _all_ officers, himself included, attend certain prescheduled mandatory trainings constitutes an adverse employment action against him specifically when another similarly situated officer, Officer Brown, was disciplined for missing same.

### 2021 Performance Evaluation

Sixth, the December 2021 performance evaluation does not constitute an adverse employment action. Plaintiff has provided no explanation as to why said evaluation is negative.[12] Although Plaintiff was offered the opportunity to provide a rebuttal on his evaluation form, he chose not to do so. (Blackwell Aff., ¶ 18 and Ex. 12 Employee Evaluation). Furthermore, even if Plaintiff disagrees with certain aspects of the performance evaluation, such an evaluation would not dissuade a reasonable worker from making a charge of discrimination. It is well-established in the Sixth Circuit that "a negative employment evaluation does not [dissuade a reasonable working from making a charge of discrimination] unless it 'significantly impact[s] an employee's wages or professional advancement.'" _Blizzard v. Marion Technical College_, 698 F.3d 275, 290 (6th Cir. 2012) (quoting _James v. Metro. Gov't of Nashville_, 243 Fed.Appx. 74, 79 (6th Cir. 2007)). Plaintiff cannot produce any evidence supporting the conclusion that the 2021 performance evaluation reduced his compensation or possibility for professional advancement.

### Captain Chris Allen's Alleged Comments

Seventh, none of the alleged comments made to Plaintiff by Captain Allen, either individually or taken together, could constitute an adverse employment action. When asked about

---

[11] Again, during Plaintiff's deposition, Plaintiff confirmed that the "younger officer" he was referring to in his Complaint is Justin Brown. (Plaintiff Dep. 101:1-11).

[12] Plaintiff failed to even reference this evaluation when provided the opportunity in Defendant's discovery requests. (Plaintiff Dep., Ex. 9, Plaintiff's Supp. Discovery Responses, Interrogatory 14).

what comments he was referring to during his deposition, Plaintiff pointed to the following. First, Plaintiff stated that the day after he came back to work, Captain Allen told Plaintiff "I hope you don't think I would come after you because of something that happened between your wife and mine years ago. I'm not that kind of person." (Plaintiff Dep. 104, 131). When asked how this constitutes ridicule, Plaintiff stated that it was an "awkward comment." (*Id.*).

Next, Plaintiff contended that on August 27, 2021, Captain Allen made "a comment to [Patrol Officer] Dues in front of [Plaintiff] that [Plaintiff is] afraid to make traffic stops." (Plaintiff Dep. 133:7-15). Regarding this purported comment, Plaintiff indicated "maybe it's considered friendly banter," and stated further, "[i]s it retaliatory? It's just uncomfortable." (*Id.*).

Finally, Plaintiff noted that on January 6, 2022, after every time he made a traffic stop and issued a warning, Captain Allen would ask him if he wrote a citation. Plaintiff freely admitted that he "do[es]n't really consider that retaliatory. Just a little uncomfortable, but [he] get[s] it." (Plaintiff Dep. 142:10-19.) Thus, based on Plaintiff's own testimony regarding these alleged stray comments, they were not "ridicule" or "degrading" as he has alleged in his Complaint and in his discovery responses. (*See* Second Amended Complaint, Doc. 50, PageID 189-90; Plaintiff Dep., Ex. 9, Interrogatory 14). More importantly, they would not dissuade a reasonable worker from making a charge of discrimination.

### *Acknowledgment of Department Policies*

Eighth, Chief Blackwell's requirement that Plaintiff acknowledge certain department policies upon his return to work does not constitute an adverse employment action. As previously noted herein, from the time Plaintiff was placed on administrative leave to the time he was returned to work (approximately 14 months), he had not performed any police work whatsoever. (Plaintiff Dep. 79:8-17). Moreover, Plaintiff himself admits that officers are required to acknowledge

32

policies on a monthly basis regardless of whether they faced discipline or were out of work for any reason. (Plaintiff Dep. 96:21-24). Plaintiff can make absolutely no argument that merely being required to acknowledge policies, which he would have had to do on a monthly basis regardless of the circumstances here, constitutes an adverse employment action.

<u>*Community Questions*</u>

Finally, Plaintiff asserts he was faced with questions from community members regarding his termination. (Plaintiff Dep. 98:1-11). Such questions would not constitute an adverse employment action. Defendant has absolutely no control over, nor could it be responsible for, what community members say to Plaintiff. Moreover, Defendant has not even alleged that Defendant told community members of his termination, and he certainly cannot point to any evidence demonstrating same. To the contrary, however, Plaintiff admitted he has told numerous community members about his termination and other information related thereto. (Plaintiff Dep., Ex. 9, Interrogatory 6; Plaintiff Dep. 98:12-14). Also, any person could find out about Plaintiff's termination, as that information is a public record. Thus, alleged actions or comments by community members relative to Plaintiff's termination, and <u>not</u> actions or comments by Defendant, cannot constitute an adverse employment action by Defendant.

Because none of the Defendant's alleged actions could constitute an adverse employment action, Plaintiff cannot satisfy the adverse employment action element of his prima facie case for retaliation. Accordingly, Plaintiff's retaliation claim fails as a matter of law.

**2. Plaintiff also cannot establish the necessary causal link.**

As previously explained, Plaintiff cannot establish an adverse employment action was taken against him. Additionally, among the adverse actions alleged, Plaintiff cannot establish a causal link between the alleged adverse actions and the protected act of filing his discrimination

33

charge with the EEOC and OCRC. Thus, Plaintiff cannot establish wither the third or fourth element of his prima facie retaliation case.

The fourth element—the causal element—looks to whether retaliation is the "but-for" cause of the adverse actions. *Goodsite v. Norfolk Southern Ry. Co.*, 573 Fed.Appx. 572, 582 (6th Cir. 2014). Plaintiff is unable to establish either sufficient temporal proximity between what he alleges as Defendant's retaliatory conduct and his Charge of Discrimination or otherwise point to evidence establishing a retaliatory motive of Defendant as the reason for the City's alleged actions. These are required elements of his claim. *Stein v. Atlas Indus., Inc.*, 730 Fed.Appx. 313, 319 (6th Cir. 2018).

Plaintiff's filing a Charge of Discrimination was clearly not the but-for reason, nor was it even a factor in Defendant's actions. Accordingly, Plaintiff cannot satisfy the causation element of his prima facie case for retaliation and, in turn, Plaintiff's retaliation claim fails as a matter of law.

### 3. Defendant has a legitimate nonretaliatory purpose for its actions, and Plaintiff cannot show that any of the Defendant's nonretaliatory purposes are pretext for retaliation.

Assuming, *purely for argument's sake*, Plaintiff can establish a prima facie case—which he cannot—Defendant has a legitimate nonretaliatory basis for each of its purported actions. As with age discrimination claims, if a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to "'offer a nondiscriminatory reason for the adverse employment action.'" *Blizzard v. Marion Technical College*, 698 F.3d 275, 288 (6th Cir. 2012) (quoting *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009)). If this burden is met by the defendant, the plaintiff then has the burden to demonstrate that the proffered reason was mere pretext. *Id.* The burden of persuasion remains with the plaintiff throughout, even while the burden of production

shifts between the parties. *Ladd* at 502 (citing *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)).

First, regarding Defendant's requirement that Plaintiff undergo a fitness for duty examination prior to his reinstatement, as previously noted, Defendant had legitimate nondiscriminatory reasons for requiring this examination. Namely, Defendant required this examination because (1) Plaintiff repeatedly indicated during his pre-disciplinary interview that his conduct and policy violations during the May 30-31, 2020 incidents were the result of stress; and (2) from the time Plaintiff was placed on administrative leave to the time he was to return to work (approximately 14 months), he had not performed any police work whatsoever. (Plaintiff Dep. 79:2-7; Blackwell Aff., Ex. 10 Fitness for Duty Examination Letter; Admin. Inter. Cam.). Thus, the fitness for duty examination was required to ensure it was safe, both for Plaintiff and to the community at large, to return Plaintiff to his position as a patrol officer. (Blackwell Aff., Ex. 10 Fitness for Duty Examination Letter; Blackwell Dep. 53; Applegate Dep. 22).

Second, regarding the City's promotion and/or hiring of Lieutenants Redmon, Jacobs, and Charles and its job offer to Ken Becker, Defendant determined it was necessary to promote and/or hire lieutenants so that supervisors were available on most all shifts. (Applegate Dep. 24:2-18; Blackwell Dep. 59:22-25, 60:1-3). Chief Blackwell had been pursuing the need for supervisors for several years, and Captain Allen also expressed a need for additional supervisor capacity across the various shifts. (Blackwell Dep. 59:22-24; Allen Dep. 46:1-9). Accordingly, Defendant had legitimate nondiscriminatory and nonretaliatory reasons for the promotional and hiring decisions it made, as more fully explained above and reiterated here.

Third, with regard to the percentage raises that Plaintiff and other bargaining unit members received, Defendant did not make the decision. (Ohio Rev. Code Chapter 4117; Plaintiff Dep., Ex.

35

11). The entire collective bargaining agreement, including its wage provisions, was bargained for by the union representing Plaintiff and ratified by the bargaining unit employees. (Plaintiff Dep., Ex. 11). Regardless, Plaintiff received a raise each year because of where he fell in the negotiated steps in the collective bargaining agreement. (*Id.*; Plaintiff Dep. 92-93).

Fourth, as for the non-disciplinary EPIPs that were issued to Plaintiff, Defendant provided detailed explanations as to why each of them was issued to Plaintiff, including identifying the specific conduct at issue and how said conduct violated specific policies. (Plaintiff Dep., Exs. 12-17). Additionally, Defendants made the choice to issue EPIPs in lieu of discipline so as to improve Plaintiff's performance without having to resort to disciplinary measures. Defendant's detailed descriptions as to why these non-disciplinary EPIPs were issued to Plaintiff, as well as its decision to take a non-disciplinary route to improve Plaintiff's performance, constitute a legitimate nonretaliatory reason for issuing them to Plaintiff.

Fifth, Defendant clearly had a legitimate nonretaliatory reason for requiring Plaintiff to attend the mandatory training on October 6, 2021. As previously mentioned, all officers, Plaintiff included, were required to attend this training. Mandatory trainings are very important, especially in the policing context where it is imperative that officers, who are protectors of the public peace, are aware of, and up to date on, various timely topics geared toward improving their skills and knowledge. Furthermore, requiring all officers to attend such trainings, as opposed to only certain officers, is the very essence of nonretaliatory conduct.

Sixth, as for Plaintiff's December 2021 performance evaluation, Defendant provided nondiscriminatory and objective explanations for the scores/ratings included therein. (Blackwell Aff., Ex. 12 Employee Evaluation). Plaintiff obviously accepted these ratings based upon his

choice to not provide any comments on the evaluation, despite having the opportunity to do so. (*Id.*).

Seventh, regarding the alleged comments that Captain Allen made to Plaintiff, Plaintiff himself negated any retaliatory purpose behind them, stating that they were merely "awkward," "a little uncomfortable," "friendly banter," or flat out stating "I don't really consider that retaliatory." (Plaintiff Dep., 104, 131, 133, 142). Plaintiff himself admits there were nondiscriminatory reasons for the three alleged comments Captain Allen made to Plaintiff.

Eighth, Chief Blackwell had a nondiscriminatory reason for requiring Plaintiff to acknowledge certain policies upon his return to work. As previously noted, officers within the Department already have to acknowledge policies on a monthly basis. (Plaintiff Dep. 96:21-24). Of course, then, upon Plaintiff's return to work after a year of not being with the Department, the City would expect him to acknowledge policies, as it does with every other one of its officers.

Finally, regarding comments that community members allegedly made to Plaintiff regarding his termination, Defendant obviously cannot speak to the motive behind, nor be responsible for, those community members' comments, assuming they were made at all. Simply stated, Plaintiff cannot allege retaliation based on the statements or conduct of the general public to which Defendant cannot control or otherwise be held accountable for.

Accordingly, Defendant has legitimate nondiscriminatory reasons for all of its alleged actions. Moreover, and similar to Plaintiff's discrimination claim above, this court is limited to determining whether Plaintiff's filing of charges with the OCRC/EEOC was ***the reason*** for Defendant's actions. Plaintiff's filing of same was clearly not ***the reason***, nor was it even a factor in Defendant's actions. To that end, Plaintiff cannot show any of these legitimate nondiscriminatory reasons are a pretext for retaliation.

18927383v3

Plaintiff is unable to sustain his burden of proving that the City's alleged actions would not have occurred but for his filing of charges with the OCRC/EEOC. As a result, Plaintiff's claims for retaliation under the ADEA and Ohio law must fail as well.

## IV.  <u>CONCLUSION</u>

Because there is not dispute as to any material fact, and because Plaintiff cannot sustain any of his claims, Defendant is entitled to summary judgment. Plaintiff is not entitled to any of the relief he seeks. Accordingly, Defendant respectfully requests the Court grant it summary judgment on all claims as a matter of law.

Respectfully submitted,

*/s/ Benjamin J. Reeb*
Beverly A. Meyer, Trial Counsel (0063807)
Arthur P. Schoulties, Co-Counsel (0086900)
Benjamin J. Reeb, Co-Counsel (100018)
BRICKER GRAYDON LLP
312 N. Patterson Blvd., Suite 200
Dayton, Ohio  45402
Telephone:  937.224.5300
Facsimile:  937.224.5301
E-mail:  bmeyer@brickergraydon.com
        aschoulties@brickergraydon.com
        breeb@brickergraydon.com
*Attorneys for Defendant*

18927383v3

## <u>CERTIFICATE OF SERVICE</u>

      This certifies that a true and accurate copy of Defendant's Motion for Summary Judgment was filed and served upon Matthew Stokely, Attorney for Plaintiff, via the Court's electronic filing system this 27th day of September 2023.

                          */s/ Benjamin J. Reeb*
                          Benjamin J. Reeb (100018)
                          BRICKER GRAYDON LLP

18927383v3