**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION (Dayton)**

| | | |
|---|---|---|
| **JEFF SMITH** | * | **CASE NO. 3:22-cv-00096** |
| | * | **JUDGE MICHAEL J. NEWMAN** |
| **Plaintiff,** | * | |
| **vs.** | * | |
| **CITY OF UNION, OHIO** | * | **PLAINTIFF JEFF SMITH'S** |
| | * | **MEMORANDUM IN OPPOSITION TO** |
| | | **DEFENDANT CITY OF UNION'S** |
| **Defendant.** | * | **MOTION FOR SUMMARY JUDGMENT** |

Now comes Plaintiff Jeff Smith ("Smith"), by and through counsel, and hereby submits his Memorandum in Opposition to Defendant City of Union's (the "City") Motion for Summary Judgment. Smith respectfully requests that this Court overrule the City's Motion for Summary Judgment in accordance with Fed. R. Civ. P. 56. on the grounds that there are numerous disputed issues of material fact. The grounds for Plaintiff Smith's opposition are more fully supported by the accompanying Memorandum, the record, the deposition testimony and supporting documents.

Respectfully submitted,

/s/ Matthew D. Stokely
Matthew D. Stokely (0062971)
PICKREL, SCHAEFFER & EBELING CO., LPA
2700 Stratacache Tower
Dayton, Ohio 45423
T: (937) 223-1130 / F: (937) 223-0339
E: mstokely@pselaw.com
*Attorney for Mr. Smith*

## COMBINED TABLE OF CONTENTS AND SUMMARY OF ARGUMENT

I.   STATEMENT OF FACTS .................................................................................................4

II.  LAW AND ARGUMENT .............................................................................................12

  A.  Summary Judgment Standard. ..............................................................................12

  B. The City Fails to Demonstrate the Absence of a Genuine Issue of Material Fact Regarding Plaintiff's Age Discrimination Claims for Unlawful Termination and Retaliation. ..................13

  1.  Age Discrimination. .......................................................................................13

The Age Discrimination in Employment Act, ("ADEA") makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). By its statutory language the ADEA makes it unlawful for an employer to discharge an employee "because of" age. Id. Pelcha v. MW Bancorp, Inc., 988 F.3d 318, 323 (6th Cir.), cert. denied sub nom. Pelcha v. Watch Hill Bank, 211 L. Ed. 2d 281, 142 S. Ct. 461 (2021). A plaintiff "must 'prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but-for' cause of the challenged employer decision.'" Id. (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78 (2009)). "This requires showing that age was the determinative reason they were terminated; that is, they must show 'that age was the "reason" that the employer decided to act.'" Id. at 324 (quoting Scheick v. Tecumseh Pub. Schs., 766 F.3d 523, 529 (6th Cir. 2014)). "Under Gross, satisfying but-for cause requires plaintiffs to show that age 'had a determinative influence on the outcome' of the employer's decision-making process." Id. (emphasis in original) (quoting Gross, 557 U.S. at 176). "So, to defeat summary judgment, [a plaintiff] must show a genuine dispute of material fact that, if resolved in h[is] favor, could persuade a reasonable juror that age was the but-for cause of h[is] termination." Pelcha at 324.

  2.  Direct Evidence of Age Discrimination. ........................................................15

A supervisor's comments may constitute direct evidence that age was a "but-for" factor in a decision to terminate an older employee. "Discriminatory remarks by decision makers and those who significantly influence the decision-making process can constitute direct evidence of discrimination." Sharp v. Aker Plant Services Group, Inc., 726 F.3d 789, 798 (C.A.6 (Ky.), 2013), citing Bartlett v. Gates, 421 Fed.Appx. 485, 489 (6th Cir.2010).

  3.  Circumstantial Evidence of Age Discrimination. .............................................18

Defendants asserted that Plaintiff has demonstrated no evidence of similarly situated employees outside of the protected class who received more favorable treatment than Smith. Defendant's Motion at PageID#337. In support of its assertion, Defendant states Plaintiff's comparators were not engaged in conduct essentially identical to the conduct Plaintiff engaged in at the time of his termination. Defendant quotes the *Mitchell* standard, as annunciated in *Ercegovich,* to determine whether comparators offered by a plaintiff to prove the fourth element of a prima facie case meet the requirement of being "similarly situated." *Id.* However, Defendant commits a serious error of understanding when it fails to place *Mitchell* in the context of the *Ercegovich* Court's direct criticism of applying the *Mitchell* standard too narrowly…

  C.  Plaintiff Has Established Sufficient Evidence to Overcome Summary Judgment. .................24

A plaintiff can demonstrate pretext in one of three ways. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008). He can show that the stated reason (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. *Id.*; *accord Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). *McNeal v. City of Blue Ash*, 2023 WL 2184598, at *8 (S.D. Ohio, 2023). Smith has established pretext by demonstrating that the City's proffered motivation for disciplining and terminating him with respect to his alleged violation of the City's pursuit policy had no basis in fact.

D.   Plaintiff Has Demonstrated that the City Unlawfully Retaliated Against Him. .....................27

Defendant argues that none of the instances of retaliation set forth by Smith constitute "adverse action" against Smith, "none of the alleged actions constitute adverse employment actions that materially and adversely change the terms or conditions of Plaintiff's employment." Defendant's Motion at PageID#347.  Contrary to the City's assertions, however, allegations that a referral for examination may be retaliatory supports a prima facie case for retaliation.  *Broach v. City of Cincinnati,* 2013 WL 3712338, at *8 (S.D. Ohio, 2013).  See Also *Hodges v. City of Milford,* 2013 WL 210278 (S.D. Ohio, Jan. 18, 2013).   Under pretense of needing Smith to undergo a psychological examination, the City objectively delayed reinstating Smith after an arbitrator ordered that Smith be reinstated to his position on June 8, 2021.

III.   CONCLUSION .......................................................................................................................30

## MEMORANDUM IN OPPOSITION

### I. STATEMENT OF FACTS

Plaintiff Jeff Smith (hereinafter referred to as "Smith" or "Plaintiff") was born on May 12, 1969, making him 51 years of age at the time of his termination by the City of Union (hereinafter referred to as the "City" or "Defendant"). Smith was initially hired as a part-time Officer in February of 2003, and has been a full-time police Officer with the City since March of 2003. Smith Dep. at 85:2-9. Smith was suspended and subsequently terminated following an investigation of two separate incidents which occurred on May 30, 2020, and on May 31, 2020. Smith Dep. Ex. 5.

At Smith's pre-disciplinary hearing, Chief Michael Blackwell made several ageist comments during the proceeding. Blackwell Dep. 31:12-15. Blackwell affirmed that he told Smith during the pre-disciplinary conference on July 8, 2020, that he had "watched videos of younger Officers that didn't make the mistakes that Jeff [Smith] made." *Id.* Blackwell further testified that he believed the aforementioned statement to be true. Blackwell testified that he referenced "younger Officers" during Smith's pre-disciplinary hearing because he believed that a "lesser experienced" Officer would have done his job better than Smith: "Yeah. I believe a lesser experienced Officer would have done better." *Id.* at 22-23. On January 8, 2021, Smith filed a Charge of age discrimination with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission. The Ohio Patrolmen's Benevolent Association (OPBA) filed a grievance on Smith's behalf and the matter proceeded to an arbitration. Following the arbitration hearing, Smith was reinstated to his position with backpay and no loss of seniority.

In support of its version of the facts, the City has submitted and cited extensively to the Arbitration Transcripts, Volumes I and II, of the arbitration hearing dates of January 20, 2021, and

February 9, 2021, respectively.[1] The City has avoided nearly all mention of the Arbitrator's Opinion and Award, issued June 8, 2021.[2] The City made no reference to any of the Arbitrator's findings of fact. Instead of citing directly to the Opinion and Award, the City supplied an affidavit from the City Police Chief, Michael Blackwell. Defendant's Ex. A. Blackwell states that "On June 8, 2021, the Arbitrator issued an Opinion and Award in which he determined the City *had just cause to discipline* Plaintiff but reinstated Plaintiff's employment by Defendant while imposing an unpaid three-day suspension in lieu of termination. (*Id;* Blackwell Aff., ¶ 16)." Defendant's Motion at PageID#332. This statement directly mischaracterizes the decision of the arbitrator, who did not make a ruling on whether the City had "just cause," "in lieu of termination." Ex. 1, at 60. The arbitrator merely stated that the City's discharge was "too severe." *Id.* Defendant has failed to set forth or even mention the outcome of Smith's arbitration hearing in its Motion. The City continues to assert only its version of the facts and circumstances surrounding its decision to terminate Smith in the City's Disciplinary Action Letter issued to Smith on August 3, 2020. Defendant's Motion, PageID#331.

Defendant's Affidavit seeks to give this Court the impression that all of the bases Defendant gave for Smith's termination were upheld by the Arbitrator, which is not the case. In fact, the Arbitrator held that the majority of Defendant's allegations offered in support of Smith's termination were "difficult to understand as a claimed act of misconduct." Ex. 1., at 51. Arbitrator Paolucci specifically held that the City's "central allegation" against Smith, namely, that Smith initiated and continued an improper pursuit on May 30, 2020, was "without merit." Ex. 1, at 54.

In arriving at his conclusion that the City's termination of Smith, and the arguments presented in support thereof, were "without merit", the Arbitrator relied specifically upon the conflicted testimony of Chief Michael Blackwell in regards to whether Smith violated any of the

---

[1] Defendant's Exhibit B, Attachments I and II.
[2] The Opinion and Award of arbitrator Michael Paolucci, Arbitrator, June 8, 2021 is marked hereto as Exhibit 1.

City's policies.  Ex. 1., at 53:

> In reaching a conclusion as to whether the Policy was violated, a review of the Chief's testimony on this point is instructive.  Under cross-examination, the Chief conceded that the Policy does not prohibit an Officer from pursuing a vehicle that has engaged in a misdemeanor, or a traffic violation.  As noted the Grievant was faced with at least a traffic violation, and perhaps a criminal trespass.  The weakness of the City's case in attempting to prove that the Grievant should not have initiated the pursuit was proven by the Chief's cross-examination where he tried to avoid the logical conclusion that the Grievant was actually correct.  At first the Chief claimed that there was not enough evidence to conclude that the Grand Am was trespassing.  When faced with the record of what occurred, and based on testimony of Allen, he finally conceded that the Grievant' s report involved a potential violation of R.C. 4511.201.  What follows is that the Grievant was not in violation of the Policy since he viewed the reckless operation of a motor vehicle on private property, and began following the driver.

Ex. 1, at 53.  Given the Arbitrator's position that Chief Michael Blackwell, on cross-examination, was engaged in trying to evade the "logical conclusion" that Smith was correct in initiating his pursuit on May 30, 2020, it is also illogical that the City would choose to rely only on the Affidavit of Michael Blackwell with respect to the arbitrator's Opinion, when it is clear that Blackwell only re-states many of the same false facts that the arbitrator found not credible. *Id.*

The arbitrator heavily criticized the City's version of the facts surrounding the events on May 30, 2020 and May 31, 2020.  For example, the City attempted to argue in earnest that "but for" Smith's pursuit of the suspect driver on May 30, 2020, she would not have engaged in her criminal behavior. *Id.* at 54.  Finally, the Arbitrator concluded that, "There is simply nothing prior to the crash that could be described as improper or in violation of the Pursuit Policy as described by the Chief." *Id.*

Aside from the City's failure to address the arbitrator's Opinion, and substitution of same with the Affidavit of Chief Blackwell, whose testimony was rejected by the arbitrator, Defendant's statement of facts contains numerous conclusory assumptions not demonstrated by the evidence in

6

this case. For example, the City states that "Plaintiff pursued the vehicle, despite his acknowledgment that he had witnessed no clear evidence of a crime. (Arb. Tr., Vol. 2, Smith 593; Smith Cam. 13:31:10-13:31:14, n. 6: "Plaintiff can be heard telling Officer Redman "I don't know why she [i.e., the driver] took off."). Defendant's Motion, at PageID#330. Smith's statement is at best an admission that he did not know the reason that the driver fled the scene in her vehicle, however, it cannot be asserted that this statement is "an acknowledgment that he had witnessed no clear evidence of a crime." In fact, the City knew that Smith had already described the suspect's criminal behavior to Captain Allen, who was assigned to do the investigation and later testified that on June 1, 2020, Smith explained to Allen that the suspect "drove through the grass area at a high rate of speed, and when she left the grass area to go on the roadway, she kicked up dirt and she was just driving extremely fast out of there." *Id.* at 42:20-24.

Moreover, Blackwell's arbitration testimony that he received a call from the Montgomery County prosecutor's office, and that as a result of Smith's conduct and termination, the charges against the suspect from the incident that occurred on May 30, 2020, had been "dropped," is inaccurate. See Arb. Tr., Vol. II, Blackwell 317:10-19. The City states that "Also, although the driver of the car Plaintiff pursued on May 30, 2020 was initially charged with a number of offenses resulting from her actions that day, **all charges had to be dropped because of Plaintiff's ineptness."** Defendant's Motion, at PageID#330, *emphasis added.* This statement is false. The suspect driver was actually convicted of the crime of "Fleeing and Eluding," under Ohio Revised Code §2921.331(B), "No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop."[3]

Smith also disputes the City's assertion that Officer Redmon "did not participate in the

---

[3] Vandalia Municipal Court, Case Information CRB2001080, Attached hereto as Exhibit 2.

pursuit along with Plaintiff..." Defendant's Motion, PageID#326. Defendant admits that Officer Redmon arrived at the church *prior to* Smith. *Id.* Captain Allen confirmed that in reviewing the video tape of Redmon's actions on May 30, 2020, Redmon arrived at the scene of the suspect's crash with his "lights and sirens" on. Arb. Tr., Vol 1, Allen 167:4-7. The City denies that Redmon played any part in the incidents which occurred on May 30, 2020. Defendant's Motion, at PageID#326. However, Redmon admitted to making several of the same mistakes that the City alleged Smith made. Redmon Dep. 12-15. Redmon admitted that he did not render any medical aid to the driver of the vehicle. *Id.* at 13. Redmon admitted that he failed to change his gloves while collecting evidence from the scene. *Id.* at 15. Redmon was not investigated, suspended or disciplined. *Id.* 16-17.

Captain Allen, who investigated Smith, gave conflicting testimony regarding whether he recommended that disciplinary action be given to Redmon, and Allen testified that he did not recommend any disciplinary action to Redmon. Arb. Tr., Vol. I, Allen 170:5-13. Then, on another occasion, during his deposition, Allen testified that he did in fact recommend that Redmon be given discipline, but that Chief Blackwell instructed him to not give Redmon disciplinary action. Allen Dep. at 49-50. Redmon was later promoted to the position of Lieutenant. *Id* at 20. Redmon himself testified that he was "surprised" when Chief Blackwell notified him of his promotion, "Because there was currently no lieutenant positions." *Id.* 20:1-16. Several other Officer younger than Smith were also subsequently promoted to the position of Lieutenant. Smith Dep. 68-69; Blackwell Dep. 56-60. These promotions occurred in the context of the City's ongoing actions resulting in delay of Smith's return to work in accordance with the Opinion and Award of the arbitrator.

On June 8, 2021, Smith was awarded reinstatement to his job, with backpay and no loss of seniority. Ex. A. The arbitrator held that the City's investigation and termination of Smith was predicated on invalid grounds, that Smith had engaged in a pursuit in violation of the City's pursuit

policies. Ex. A, at 54. The City initially refused to reinstate Smith in accordance with the arbitrator's decision. Instead, the City unreasonably delayed returning Smith to work by ordering that he undergo a psychological examination, not because the City has any set procedure for doing so, but rather, based on statements it alleged were made by Smith during his investigative interview, which was well over a year prior to the date of the arbitrator's order to reinstate Smith. Blackwell Dep, at 54.

The City asserted at the time, that the reason Smith was given a psychological examination was that Smith mentioned in June of 2020, to Captain Allen, that he had been "stressed" at the scene of the incident on May 30, 2020. *Id.* The City asserted that this statement alone provided grounds to have Smith undergo psychological fitness for duty examination. *Id.* However, the City has more recently provided additional reasons as to why it had Smith undergo an examination in July of 2021, and now, for the first time, asserts that it had "objective reasons to question" Smith's "ability to perform his or her duties in a manner that protects the safety of the Officer and the safety of the public at large." Defendant's Ex. A, Blackwell Aff. ¶14. However, the City fails to name any additional "objective reasons" for delaying Smith's return to work.

Smith attended the psychological fitness-for-duty examination that the City scheduled for July 16, 2021, conducted by Dr. Quarry. Smith Dep. at 128. Smith testified that Dr. Quarry told him the City had described Smith as "totally different than what I was." *Id.* at 128:7-16; 19-22. Dr. Quarry unequivocally cleared Smith to return to work seven (7) days later, on July 24. *Id*. at 128-29. However, upon receipt of the doctor's recommendation to return Smith to work, the City refused to abide by the opinion of the doctor of the City's own choosing. Instead, the City asked Dr. Quarry to view the video from Smith's bodycam during the incident on May 30, 2020 and to make a redetermination of his opinion based on the video footage. *Id.* at 129. Dr. Quarry reviewed the video footage and his opinion that Smith could be returned to work did not change. *Id.* Dr. Quarry

contacted Smith directly nearly two (2) weeks after he had returned Smith to work the second time. *Id.* 129:17 Dr. Quarry inquired how things were now that Smith was back at work, and Smith responded that he had not been returned to work. *Id.* Dr. Quarry stated that he had returned Smith to work, "twice." *Id.* That same day, August 11, 2021, Smith received a call from Chief Blackwell, giving Smith a return date of August 16, 2021. *Id.* 129-130. By that time, the City had delayed returning Smith for over a month since the Opinion and Award of the arbitrator issued on June 8, 2021.

While Smith was waiting for the City to return him to work after the arbitrator awarded Smith's reinstatement on June 8, 2021, the City began to promote and re-hire younger Officers to Lieutenant positions. Blackwell Dep., at 56-57; Smith Dep., at 68-70. These promotions all took place in July of 2021, after Smith's arbitration award, but before the City returned Smith to work. Blackwell Dep., at 56. On July 21, 2021, Greg Redmon was promoted to the Lieutenant position. *Id.* The City also re-hired a much younger Officer, Jacobs, from another City, to fill the position of Lieutenant. *Id.* Although Chief Blackwell denied having any knowledge that Jacobs had been placed under an investigation for misconduct and had subsequently resigned prior to being issued any disciplinary action, the record shows that Jacobs had been investigated. See Ex. 8, to Smith Dep., Internal Investigation, at 155-56, Even so, Chief Blackwell testified that he had obtained a reference for Jacobs. Blackwell Dep., at 59.

However, Captain Allen's testimony regarding whether Blackwell actually obtained an employment reference for Jacobs calls into question whether any reference was obtained by the City before it hired Jacobs at the Lieutenant level, above Smith. Allen Dep., at 55-56. The City was aware at the time it promoted these younger Officers, that the City had lost the arbitration, and that Smith would be returned with work with the same level of seniority that Smith had when it terminated Smith in 2020. Smith had more seniority than any other police officer in the City of

10

Union. Furthermore, during this same period of time, the City engaged in conduct that delayed Smith's return to work, even after he had been reinstated by the Arbitrator on June 8, 2021.

On or about August 13, 2021, after the City promoted and hired several younger Officers to fill the Lieutenant positions, the City completed contract negotiations with the Fraternal Oder of Police ("FOP"). As a result of these negotiations, conducted by the City, Smith was the only person who did not receive a substantial increase in pay for 2020, while for the years 2022 and 2023, all other employees were set to receive much higher percentage increases in pay than Smith. Smith Dep., at 91-94. The City's own proposal recommended that Smith be given a -0- increase in pay.[4] The City returned Smith to work three (3) days after it completed these negotiations with the FOP, resulting in Smith alone receiving substantially less pay than the younger Officers that the City promoted. *Id.* During these events, the City continued to delay Smith's return to work in accordance with the Arbitration Award. These events in connection with the City's unreasonable delay in returning Smith to work further demonstrate that the City retaliated against Smith.

When the City finally returned Smith to work on August 16, 2021, several of the other Officers approached Smith and warned him that the City would be "watching him" and intended to micro-manage Smith. Smith Dep., at 99-100. Shortly thereafter, the City began to issue disciplinary action to Smith more frequently than it had in the past. On September 4, 2021, Smith was given an Employee Performance Improvement Plan ("EPIP") in regards to an alleged schedule change issue. Ex. 12, Smith Dep. Smith was never notified of the change, and Smith gave rebuttal to the disciplinary action, noting that he had received several schedule changes that had been made on September 1, 2021 for work dates on September 3, September 8, and September 9, but that the record demonstrated he did not receive any schedule change notification for September 4, the date the City alleged that he was late for work. *Id.* On or about October 20, 2021, Smith received a

---

[4] City of Union 2021 Contract Negotiations, Attached hereto as Exhibit 3.

Letter of Reprimand.  Ex. 13, Smith Dep.  The FOP filed a grievance an on December 7, 2021, the letter of reprimand was removed and the grievance was sustained on Smith's behalf.  Smith received additional "EPIP's" on November 28, 2022, March 27, 2023, and July 4, 2023. *Id.,* Ex. 15, 16, 17.

In contrast to the frequency of disciplinary action that Smith began to receive after his reinstatement and after he had filed a charge of age discrimination against the City, during the entire five-year period leading up to his termination in 2020, Smith had a total of seven (7) instances of disciplinary conduct from the City.  Ex. A, at 34.  Most recently, Smith had received only one (1) instance of disciplinary action during the entire year in 2019. *Id.*  Smith's most recent suspension had occurred in December of 2014.  *Id.*

Smith filed a second charge of discrimination and retaliation with the Ohio Civil Rights Commission and the EEOC on or about May 16, 2022, alleging retaliation, disciplinary action, harassment and failure to promote by the city in retaliation for Smith filing and pursuing an age discrimination charge.   Smith Dep. Ex. 7, PageID#1952-1954.   Smith asserted that since his employment was reinstated by an arbitrator, he had been subject to various discriminatory acts that he believed were based on his age and in retaliation for pursuing his prior age discrimination charges.  *Id.* at PageID#1958-59. Contrary to the City's statement that Smith "dismissed" this charge, Smith availed himself of the available procedures and requested that the EEOC issue a Notice of Right to Sue in lieu of a full investigation.  *Id.* at PageID#1955.  The EEOC issued a Notice of Right to Sue in October 2021 on Smith's second charge of discrimination and retaliation. *Id.* at PageID#1964.

## II.    LAW AND ARGUMENT

### A.    Summary Judgment Standard.

Plaintiff agrees with Defendant that the standard set forth in *Celotex v. Catritt,* 477 U.S.

317 (1986) is the appropriate standard to be followed in a motion for summary judgment.

      **B.    The City Fails to Demonstrate the Absence of a Genuine Issue of Material Fact Regarding Plaintiff's Age Discrimination Claims for Unlawful Termination and Retaliation.**

          **1.   Age Discrimination.**

The Age Discrimination in Employment Act, ("ADEA") makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). By its statutory language the ADEA makes it unlawful for an employer to discharge an employee "because of" age. *Id. Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 323 (6th Cir.), *cert. denied sub nom. Pelcha v. Watch Hill Bank*, 211 L. Ed. 2d 281, 142 S. Ct. 461 (2021). A plaintiff "must 'prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but-for' cause of the challenged employer decision.'" *Id.* (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)). "This requires showing that age was the determinative reason they were terminated; that is, they must show 'that age was the "reason" that the employer decided to act.'" *Id.* at 324 (quoting *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir. 2014)). "Under *Gross*, satisfying but-for cause requires plaintiffs to show that age '*had a determinative influence on the outcome*' of the employer's decision-making process." *Id.* (emphasis in original) (quoting *Gross*, 557 U.S. at 176). "So, to defeat summary judgment, [a plaintiff] must show a genuine dispute of material fact that, if resolved in h[is] favor, could persuade a reasonable juror that age was the but-for cause of h[is] termination." *Pelcha* at 324.

In a case involving a violation of the ADEA, a plaintiff can survive a motion for summary judgment either by presenting direct evidence of discrimination or circumstantial evidence from which a jury may infer a discriminatory motive. *Pelcha* at 324., *accord Kline v. Tennessee Valley Authority*, 128 F.3d 337, 348 (6th Cir. 1997). "If a plaintiff cannot show age discrimination with

direct evidence, plaintiff may attempt to show age discrimination with circumstantial evidence, which the Court must evaluate using the three-step burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." *Pelcha*, 988 F.3d at 324. "This analysis 'first requires the plaintiff to establish a prima facie case of discrimination.'" *Id.* at 324-25. "If the plaintiff succeeds, the burden of production shifts to the employer to identify a legitimate, nondiscriminatory reason for the termination." *Id.* "Once the employer identifies a reason, the burden shifts back to the plaintiff to prove the employer's reason is a mere pretext." *Id.* "If the plaintiff prevails, the factfinder may reasonably infer discrimination." *Id.*

To establish a prima facie case of age discrimination under the ADEA, a plaintiff must show (1) that he is a member of a protected class, *i.e.*, over 40 years old, (2) that he suffered an adverse employment action, (3) that he was qualified for the position, and (4) circumstances that raise a plausible inference of discrimination. *Id.* at 326 (citing *Geiger v. Tower Auto.*, 579 F.3d 614, 622-23 (6th Cir. 2009)).

With respect to satisfying the fourth element of a prima facie case, the plaintiff "must demonstrate circumstances from which a jury could reasonably infer that impermissible discrimination was at the root of [the employer]'s decision to terminate." *McNeal v. City of Blue Ash,* 2023 WL 2184598, at *7 (S.D. Ohio, 2023). The typical ways to do so are by showing either that the employer replaced the plaintiff with a younger employee or that the employer treated similar situated, non-protected employees more favorably. *McNeal v. City of Blue Ash*, 2023 WL 2184598, at *7 (S.D. Ohio, 2023), citing *Smith v. Advancepierre Foods, Inc.*, No. 1:18-CV-242, 2020 WL 3488580, at *7 n.4 (S.D. Ohio June 26, 2020).

Another example of circumstances that support an inference of discrimination in age discrimination cases are "ageist comments—comments that fall short of constituting direct evidence—as potential circumstantial evidence of discrimination." *McNeal v. City of Blue Ash*,

2023 WL 2184598, at *7 (S.D. Ohio, 2023) citing *Pelcha*, 455 F. Supp. 3d at 503 (citing *Diebel v. L & H Res., LLC*, 492 F. App'x 523, 530-31 (6th Cir. 2012)). Regardless of these specific examples, "the fourth prong requires 'circumstances which support an inference of discrimination.' " *Id.* (quoting *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 808 (6th Cir. 2020)).

The fourth prong can also be established with evidence that the Plaintiff was "treated differently than similarly-situated individuals." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004). Thus, aside from any discussion of pretext, which comes later during the burden-shifting analysis, "the fourth element of the prima facie case may be satisfied by showing that persons outside the protected class were retained in the same position or that there was some other evidence indicating that the employer did not treat age neutrally in deciding to dismiss the plaintiff." *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 421 (6th Cir. 1999). With such evidence, a claim for actionable discrimination is established. *Speed Way Transp., LLC v. City of Gahanna*, 2023 U.S. App. LEXIS 5135 (6th Cir. 2023); *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405 (6th Cir. 2008).

### 2. Direct Evidence of Age Discrimination.

A supervisor's comments may constitute direct evidence that age was a "but-for" factor in a decision to terminate an older employee. "Discriminatory remarks by decision makers and those who significantly influence the decision-making process can constitute direct evidence of discrimination." *Sharp v. Aker Plant Services Group, Inc.,* 726 F.3d 789, 798 (C.A.6 (Ky.), 2013), citing *Bartlett v. Gates,* 421 Fed.Appx. 485, 489 (6th Cir.2010).

Plaintiff's termination occurred following a pre-disciplinary conference held on July 8, 2020, involving incidents that took place on May 30, 2020 and May 31, 2020. During this pre-disciplinary conference, the City cited a laundry list of policy violations on the part of Smith to support his termination. See Defendant's Motion, at PageID# 331. The City's rationale for each

15

and every one of these purported violations as a basis for Smith's termination was subsequently overturned by an Arbitrator's decision on June 8, 2021 or held to be mitigated by other facts. Smith was reinstated to his position with backpay and no loss of seniority. Chief Blackwell and City Manager John Applegate were among those present at the pre-disciplinary conference. Smith Dep., Ex. 5.

During his testimony, Blackwell affirmed that he told Smith during the pre-disciplinary conference on July 8, 2020, that he had "watched videos of younger Officers that didn't make the mistakes that Jeff [Smith] made." Blackwell Dep. 31:12-15. Blackwell further testified that he believed his statement to be true. Blackwell stated that he referenced "younger Officers" because he believed that a "lesser experienced" Officer would have done _better_: "Yeah. I believe a lesser experienced Officer would have done better." *Id.* at 31:22-23. Blackwell's discriminatory motive arises in the context of this statement alone.

Contrary to the City's assertion that Blackwell's statements "had nothing to do with Plaintiff's age, but instead contemplated issues concerning Plaintiff's high level of training and experience in combination with the severity and seriousness of Plaintiff's mistakes," Blackwell's statement that he believed the "younger" or "less experienced Officer" would have done better than Smith points directly at Smith's age in a negative light towards older, or more "experienced" workers. Defendant's Motion, Doc#57, Page 19 of 44, PageID#336. A jury could find that a less experienced individual would not normally "do better" than a more experienced one, and infer from Blackwell's statement that he was in fact speaking of Smith's age as a determinative factor in the adverse action that the City took towards Smith. Blackwell's statement that a lesser experienced Officer would actually have done better is more consistent with bias against older Officers, who may happen to have more experience.

The City's assertion that Blackwell's comments "had nothing to do with Plaintiff age, but

instead contemplate issues concerning Plaintiff's high level of training and experience in combination with the severity and seriousness of Plaintiff's mistakes" (Defendant's Motion, PageID#336) fails to take into account, or offer any explanation for the fact, that Blackwell himself did not say this. Blackwell said that he thought officers with *less* experience performed *better*. Blackwell Dep., 31:20-25; 32:1. This statement, together with Blackwell's previous statement about "younger officers," is direct evidence of the City's discriminatory attitude towards Smith, who at the time of his termination was the most senior Officer in terms of age.

Blackwell's blatantly ageist statement about "younger officers" and his comparison of Smith to "younger officers" in an unfavorable light, are direct evidence of discriminatory motive on the part of the City. Blackwell made the statement during Smith's pre-disciplinary hearing, and then, Blackwell recommended to the City Manager that Smith be terminated. Arb. Tr. Vol. I, Blackwell, 341:21-25. Furthermore, Blackwell's statements during the pre-disciplinary hearing were directly corroborated by City Manager John Applegate, who admitted that he specifically remembered Blackwell made the comment about "younger Officers" during the pre-disciplinary meeting. Applegate Dep. 18:12-19. Blackwell had "significant influence" over the decision-making process. Therefore, his statements constitute direct evidence of age discrimination.

Age-related comments are evidence of discrimination only if they are "1) related to the protected class of persons of which the plaintiff is a member; 2) proximate in time to the complained-of adverse employment decision; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." *Southworth v. N. Trust Securities, Inc.*, 960 N.E.2d 473, 476, 195 Ohio App.3d 357, 362, 2011 -Ohio- 3467, ¶ 6 (Ohio App. 8 Dist., 2011), See also *Cooley v. Carmike Cinemas, Inc.* (C.A.6, 1994), 25 F.3d 1325, 1330.

Blackwell's ageist comments were related to the employment decision at issue and therefore

satisfy all four of the criteria listed above. Blackwell's references to "younger officers" occurred *during* Smith's pre-disciplinary hearing—the proximity in time element above is certainly met. Blackwell specifically was comparing Smith's performance to the performance of what Blackwell termed "younger officers." Furthermore, Blackwell clearly had significant influence over the decision to terminate Smith, and, the statements Blackwell made went directly to the issue at hand, whether Smith would be terminated. Blackwell's age-related statements satisfy the fourth prong listed above as being "related to the employment decision at issue." Contrary to the City's assertion that these ageist comments were "taken out of context," these statements were made by a decision maker during a discussion of Smith's work performance, and Blackwell also stated that he believed younger, more experienced Officers ***performed better.***

As such, Blackwell's statements during Smith's pre-disciplinary hearing are sufficient to establish a discriminatory motive on the part of the City. Blackwell's statements did not occur outside of a disciplinary context, or in passing. They were not "stray remarks." Blackwell was directly referring to his own opinion regarding Smith's performance, and Blackwell stated that he felt younger Officers would perform better than Smith, at the very meeting that formed the basis of the decision to terminate Smith.

### 3. Circumstantial Evidence of Age Discrimination.

Even if the Court accepts Defendant's assertion regarding the sufficiency of Plaintiff's direct evidence of ageist statements made by decision makers during Plaintiff's pre-disciplinary hearing, this Court must reject Defendant's statement of the law regarding circumstantial evidence to satisfy the fourth prong of Plaintiff's prima facie case of age discrimination. Defendants asserted that Plaintiff has demonstrated no evidence of similarly situated employees outside of the protected class who received more favorable treatment than Smith. Defendant's Motion at PageID#337. In support of its assertion, Defendant states Plaintiff's comparators were not engaged in conduct

essentially identical to the conduct Plaintiff engaged in at the time of his termination.  Defendant

quotes the *Mitchell* standard, as annunciated in *Ercegovich,* to determine whether comparators

offered by a plaintiff to prove the fourth element of a prima facie case meet the requirement of

being "similarly situated."  *Id.*   However,  Defendant commits a serious error of understanding

when it fails to place *Mitchell* in the context of the *Ercegovich* Court's direct criticism of applying

the *Mitchell* standard too narrowly:

> We held that to be deemed "similarly-situated" in the disciplinary
> context, "the individuals with whom the plaintiff seeks to compare
> his/her treatment must have dealt with the same supervisor, have been
> subject to the same standards and have engaged in the same conduct
> without such differentiating or mitigating circumstances that would
> distinguish their conduct or the employer's treatment of them for it."

*Mitchell,* 964 F.2d at 583. *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352, 1998

Fed.App. 0268P, 10 (C.A.6 (Ohio),1998) However, the Sixth Circuit specifically warned *against* a

too-narrow reading of the *Mitchell* "similarly situated" standard in the context of establishing a

prima facie case for age discrimination.[5] In *Ercegovich,* the Court specifically criticized the misuse

of the *Mitchell* standard:

> Thus, under the district court's narrow reading of *Mitchell,* an employer
> would be free to discriminate against those employees occupying "unique"
> positions. This circuit has never endorsed such a narrow construction of
> *Mitchell.* Rather, as explained above and as held previously by this court in
> *Pierce,* we simply require that the plaintiff demonstrate that he or she is
> similarly-situated to the non-protected employee in all *relevant* respects. A
> contrary approach would undermine the remedial purpose of the anti-
> discrimination statutes.

*Ercegovich v. Goodyear Tire & Rubber Co*., 154 F.3d 344, 353, 1998 Fed.App. 0268P, 12 (C.A.6

(Ohio),1998).

     In *Mitchell,* the employee sued on grounds of both race and age discrimination and failed to

establish that she was "similarly situated" to white employees who had not been disciplined for

---

[5] *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352, 1998 Fed.App. 0268P, 10 (C.A.6 (Ohio),1998)

allegedly having done "worse things" than the plaintiff.

> According to Plaintiff, these "facts" establish a *prima facie* case that non-minority employees, guilty of conduct of "comparable seriousness" to the conduct for which she was fired, received more lenient treatment. However, as the facts of this case demonstrate, Plaintiff's allegations regarding other employees not being fired for different, but what she subjectively believes to be more serious, misconduct simply does not satisfy that element either.

*Mitchell v. Toledo Hosp*., 964 F.2d 577, 583 (C.A.6 (Ohio), 1992). Unlike the facts and circumstances surrounding the comparators offered by *Mitchell*, in the instant case Smith's comparators were responding to the same police call on May 30, 2020 and performing many of the same duties, making similar mistakes. Redmon performed many of the same duties as Smith that day, and, made many of the same alleged policy violations as Smith. Therefore, the *Mitchell* framework is not analogous to the facts demonstrated here.

Other cases in the Sixth Circuit have followed *Ercegovich* with respect to the framing of the similarly-situated standard. For example, in *Martin v. Toledo Cardiology Consultants,* the Court held that the district court's framing of the similarly-situated standard was too narrow and an exact correlation "not required by the law of this circuit." 548 F.3d 405, 412 (C.A.6 (Ohio), 2008). The Court stated that "The prima facie showing is not intended to be onerous." *Id.*, See also, *Jackson v. FedEx Corp. Servs., Inc.* 518 F.3d 388, 396 (6th Cir.2008). *Martin* also held that "The district court's overly narrow and restrictive definition of similarly situated made it virtually impossible for plaintiff to make a prima facie showing." *Martin* at 412.

The facts and circumstances of the incident which took place on May 30, 2020, with respect to whether Officer Greg Redmon was "similarly situated" to Smith, are material and in dispute. There is sufficient evidence of record to demonstrate that Officer Greg Redmon was a similarly situated employee, not a member of the Plaintiff's protected class, who was treated more favorably than Smith. Defendant attempts to distinguish (Defendant's Motion, PageID#337-338), the conduct

of Redmon, offering only a conclusory statement that Redmon's *actions* compared to his fellow Officer's *actions* were "vastly different and objectively distinguishable from those of Plaintiff." *Id.* at PageID#339. Defendant's characterization of Redmon's role in the incident on May 30, 2020 is objectively a too-narrow reading of the facts for the purpose of establishing whether Redmon was similarly situated to Plaintiff.

Redmon was actively engaged at the scene on May 30, 2020, and later admitted that he committed many of the same alleged policy violations that the City accused Smith of making. Redmon Dep. 13-15. Redmon confirmed that the City opened an investigation into Smith, but did not open any investigation or discipline Redmon, who admitted that he made several of the same mistakes made by Smith at the same police call. Redmon Dep. at 13-15. In fact, Captain Chris Allen, who investigated the incidents which took place on May 30, 2023, and who interviewed Smith and compiled an investigative report, testified that Redmon was "involved in the pursuit incident," and that he had recommended that Greg Redmon be disciplined for his policy violations that day:

Page 50

| | |
|---|---|
| 1 | Redmon, he was involved in the pursuit incident |
| 2 | that involved Jeff, right? |
| 3 | A.　　Yes. |
| 4 | Q.　　He didn't receive any discipline |
| 5 | at all for his actions in that event, right? |
| 6 | A.　　Correct. |
| 7 | Q.　　And then did you do any |
| 8 | investigation of him? |
| 9 | A.　　No. |
| 10 | Q.　　Why not? |
| 11 | A.　　I was told not to. |
| 12 | Q.　　Who told you not to? |
| 13 | A.　　Chief Blackwell. |
| 14 | Q.　　Did you feel it would be |
| 15 | appropriate to do an investigation of Redmon? |
| 16 | A.　　I felt based on what I saw he |
| 17 | should be given a letter of reprimand was my |
| 18 | opinion. |

21

19    Q.    Did you express that opinion to
20    the chief?
21         MR. SCHOULTIES: Objection. You can
22    answer that if you know why Chief didn't do that.

Page 51

1   BY MR. STOKELY:
2    Q.    Did he tell you?
3    A.    It's a very difficult question to
4    answer because I don't understand his
5    explanation. That's a question for him.
6    Q.    So what did he say? I mean –
7    A.    He said that he felt that just
8    talking to Redmon would address the issues that
9    he felt were a problem with Redmon and that
10    Redmon would correct those actions.
11    Q.    What kind of things are we talking
12    about needed to be corrected?
13    A.    From my memory, body camera issues
14    and wearing proper protective equipment,
15    gloves.

Allen Dep. at 49-51. However, in his prior testimony given at the union arbitration, Allen testified, contrary to his subsequent deposition testimony. Allen testified that he did <u>not</u> recommend any disciplinary action to be given to Officer Redmon, even though, during the same interview, Allen testified that Officer Redmon violated the City's body cameras policy. Arb. Trans., Vol I, 170:5-13. At the union arbitration, Allen also testified that Redmon should have rendered aid to the suspect during the incident on May 30, 2020. *Id.* at 171:24-25, cont. on 172:1-7. Captain Allen admitted during his arbitration testimony that Redmon would not have known at the time whether Smith had rendered aid to the suspect or not, and stated, "Well, since Officer Smith chose not to, I guess, yes, he [Redmon] should have, but there's no way for him to know that he did or didn't." *Id.* at 172:1-3.

Given this contradictory testimony given by Captain Allen regarding the same incident on May 30, 2023 involving both Smith and Redmon, the City's position that Redmon was not "similarly situated" to Smith regarding the actions taken by Redmon on May 30, 2023 cannot be maintained. Redmon was similarly situated, younger, and treated more favorably than Smith. Contrary to

22

Redmon's statement that he "did not participate in the pursuit along with Plaintiff because he recognized it as invalid," (Arb. Tr., Vol 1, Redmon 240:8-21, Defendant's Motion at PageID#338), Captain Allen confirmed that in reviewing the video tape of Redmon's actions on May 30, 2020, the video showed that Redmon arrived at the scene of the suspect's crash with his "lights and sirens" on. Arb. Tr., Vol 1, Allen 167:4-7. The fact that Redmon arrived at the scene with his lights and sirens on presents a disputed issue of fact as to whether Redmon engaged in the pursuit of the suspect along with Smith, and therefore calls into question the City's assertion that Redmon was not "similarly situated" to Smith in regards to Redmon's policy violations, for which he received no discipline. Allen's testimony that Redmon arrived at the scene of the crash with his "lights and sirens on" makes it more likely than not that Redmon actually was engaged in the pursuit. Contrary to the City's version of the facts, Redmon was in fact a similarly situated younger employee engaged in the same conduct as Plaintiff Smith. However, Smith received disciplinary action for the pursuit, while Redmon did not receive any discipline at all from the City. As such, Smith establishes the fourth element of his prima facie case, that a similarly situated younger Officer did not receive any disciplinary action for the same conduct.

Blackwell's statements regarding "younger Officers," in the context of being made during a pre-disciplinary hearing to discuss whether Smith would be disciplined, may also serve as circumstantial evidence of discriminatory motive on the part of the City. It is significant that these statements by Blackwell were made in the context of Smith's disciplinary hearing. As such, they are not "stray, isolated" comments that are "merely vague, ambiguous, or isolated remarks" as the City claims. Defendant's Motion, PageID#336.

Likewise, the City's argument that Blackwell's statements, even if evidence of a discriminatory motive on the part of the City, should not be given credence because it was the City Manager, John Applegate, who actually terminated Smith, lack merit as an argument that

23

Blackwell's statements should not be attributed to the City simply because of a technicality that the City Manager issued the formal termination to Smith. Defendant's Motion, PageID#336. This ignores the fact that it was Chief Blackwell who made the decision to investigate Smith for the incidents on May 30, it was Chief Blackwell's decision to suspend Smith pending the investigation, and, it was Chief Blackwell who made the independent decision to refrain from investigating the other Officer, Greg Redmon, who was at the scene on May 30 with Smith.

The City cites no applicable legal authority for its assertion here, and in fact the assertion is contrary to the application of the "Cat's Paw" theory of employer liability, where a plaintiff alleging liability under the cat's paw theory seeks "to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Marshall v. The Rawlings Company LLC*, 854 F.3d 368, 377 (C.A.6 (Ky.), 2017), citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 415, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011). In *Marshall,* the Court explained that the purpose of applying the "Cat's Paw" theory was to avoid a situation where employers "might seek to evade liability ... through willful blindness as to the source of reports and recommendations." *Id.* at 378.

The City has attempted to evade liability for its reliance on Chief Blackwell as a decision maker present during Smith's pre-disciplinary hearing, and Defendant's argument fails as a matter of law. As such, Blackwell's ageist comments during Smith's pre-disciplinary hearing constitute additional evidence, whether direct or circumstantial, of the City's discriminatory motive.

## C. Plaintiff Has Established Sufficient Evidence of Pretext to Overcome Summary Judgment.

A plaintiff can demonstrate pretext in one of three ways. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008). He can show that the stated reason (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. *Id.*; *accord Seeger*

24

*v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). *McNeal v. City of Blue Ash*, 2023 WL 2184598, at *8 (S.D. Ohio, 2023).

Smith has established pretext by demonstrating that the City's proffered motivation for disciplining and terminating him with respect to his alleged violation of the City's pursuit policy had no basis in fact. Notwithstanding that the City continues to maintain that Smith was engaged is an "unjustified initiation and continuation of pursuit," (Defendant's Motion, PageID# 331,), several of the City's witnesses testified that the basis for the City's assertion was unfounded. The City continues to maintain that Smith's pursuit was unjustified primarily because "Plaintiff witnessed no clear evidence of a crime before initiating his pursuit, confirming the same when he told Officer Redmon affirmatively, and unequivocally, 'I don't know why she took off.'" Defendant's Motion at PageID#338.

However, Captain Chris Allen's testimony at the union arbitration proceedings on this subject contradicts the City's assertions. Allen testified that on June 1, 2020, the day that he opened his investigation of Smith, that he actually talked with Smith regarding the incident on May 30, 2020. Arb. Tr., Allen at 40:1-10. Allen testified that Smith told him that day, that Smith agreed that the suspect driver involved in the incident on May 30, 2020, was operating the automobile in a reckless fashion, in addition to the charges that Smith had already listed in his report of the incident: Failure to comply with an order, driving under suspension, failure to control. *Id.* at 41:2-17. Allen testified that on June 1, 2020, Smith explained to Allen that the suspect "drove through the grass area at a high rate of speed, and when she left the grass area to go on the roadway, she kicked up dirt and she was just driving extremely fast out of there." *Id.* at 42:20-24.

Later in his testimony at the arbitration proceedings, Allen failed to disclose the June 1, 2020 conversation that he had with Smith. Allen testified that he interviewed Smith on a second occasion, June 9, 2020, as part of his internal investigation. Arb. Tr. Vol. I, 121:8-14. There, Allen

states that during the June 9, 2020 interview, Smith could not identify a reason why Smith initiated his pursuit of the suspect on May 30, 2020. *Id.* at 128:16-21. Allen fails to disclose at that point that he had previously interviewed Smith on June 1, 2020, and that the two of them had established agreement that the suspect was operating her vehicle in a reckless manner as she took off.

Nevertheless, Chief Blackwell testified that any of the charges initially given by Smith in his report would have been sufficient for Smith to initiate a pursuit:

Page 367

```
1    Q.      Now, under the pursuit policy, are
2    Officers in the City of Union prohibited from
3    pursuing lights and sirens minor misdemeanor
4    traffic violators?
5    A.      No.
6    Q.      And under the pursuit policy, are
7    Officers in the City of Union prohibited from
8    pursuing lights and sirens misdemeanor traffic
9    offenders?
10   A.      No.
11   Q.      And under the pursuit policy, are
12   Officers prohibited from pursuing lights and
13   sirens those that committed misdemeanors?
14   A.      No.
```

Arb. Tr. Vol. I, Blackwell 367:1-14. Blackwell's acknowledgment that there was no policy preventing Smith from engaging in his pursuit of the suspect demonstrates pretext, because there was no basis in fact to discipline Smith.

The third way to establish pretext, "generally consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *McNeal v. City of Blue Ash*, 2023 WL 2184598, at *8 (S.D.Ohio, 2023), *accord Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). Plaintiff must demonstrate that he is similarly situated to the non-protected employees in all relevant respects. *Id.,* see also

26

*Riley v. PNC Bank, Nat. Ass'n*, 602 F. App'x 316, 321 (6th Cir. 2015) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998)). "The comparable employees must have 'dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (quoting *Ercegovich*, 154 F.3d at 352). "If a plaintiff demonstrates this, then the factfinder can infer illegal discrimination. "In other words, it creates a genuine, triable issue of material fact." *Id.,* see also *Flones v. Beaumont Health System*, 567 Fed.Appx. 399, 406 (6th Cir.2014).

As demonstrated above, Plaintiff has established that sufficient evidence exists, both direct and circumstantial, to create several issues of material fact as to whether the City had a discriminatory motive for the actions that it took against Smith. Smith has established a prima facie case for age discrimination and this Court should deny Defendant's Motion for Summary Judgment.

      **D.**    **Plaintiff Has Demonstrated that the City Unlawfully Retaliated Against Him.**

Defendant argues that none of the instances of retaliation set forth by Smith constitute "adverse action" against Smith, "none of the alleged actions constitute adverse employment actions that materially and adversely change the terms or conditions of Plaintiff's employment." Defendant's Motion at PageID#347. Contrary to the City's assertions, however, allegations that a referral for examination may be retaliatory supports a prima facie case for retaliation. *Broach v. City of Cincinnati,* 2013 WL 3712338, at *8 (S.D. Ohio, 2013). See Also *Hodges v. City of Milford,* 2013 WL 210278 (S.D. Ohio, Jan. 18, 2013). Under pretense of needing Smith to undergo a psychological examination, the City objectively delayed reinstating Smith after an arbitrator ordered that Smith be reinstated to his position on June 8, 2021.

Defendant refused to bring Plaintiff back to work after the arbitration awarded reinstatement and instead ordered Smith to undergo a psychological examination, which was not scheduled to

occur until July 16, 2021, more than a month after the arbitrator ordered the City to reinstate Smith. Smith Dep. 128:7-23. Smith attended the examination with Dr. Quarry on July 16, 2021. *Id.* Dr. Quarry indicted to Smith that he would clear Smith for duty within the following seven (7) days. *Id.* However, the City still did not act on Dr. Quarry's opinion that Smith could return to work. Instead, the City took further retaliatory action by questioning Dr. Quarry's opinion and asking Dr. Quarry, for the first time, to review the videotape from Smith's May 30, 2020 incident "to support their belief that I'm unfit, delaying my return." Smith Dep. 129:3-5. On August 3, 2021, Dr. Quarry confirmed that the videos he reviewed only supported his belief that Smith could be returned to work. On August 11, Dr. Quarry contacted Smith at home to confirm that Smith was returned to work. Smith was not yet returned to work. Dr. Quarry responded to Smith that he, Dr. Quarry had returned Smith to work, twice. That same day, the City contacted Smith and scheduled him to return to work on August 16, 2023.

The reason given by the City as to why it required Smith to undergo a psychological examination in order to return to work after the arbitrator's order reinstated Smith lacks credibility. The City entire justification for not immediately returning Smith to duty and instead, sending him for psychological testing, was because Smith had mentioned during his interview in June of 2020 regarding the incidents that took place on May 30, 2020 and May 31, 2021, that Smith had been "stressed" during the incidents. Arb. Tr., Vol I, Allen at 142. Alternatively, the City argues that it ordered the examination due to the fact that Smith had been on administrative leave from June of 2020 to the time he returned to work in August of 2021, and that he had performed no police work during that time "whatsoever." Defendant's Motion, Page ID# 348.

The City's reason in this regard may be seen as pretextual, precisely because the City relied on a statement Smith made *over a year prior to his reinstatement*, and, the fact that the City ordered Smith to undergo a *psychological examination,* but did not also order a *physical examination* at the

same time. Blackwell Dep. 53; Applegate Dep. 22. Furthermore, Smith's Collective Bargaining Agreement clearly states that the City must have had "reasonable cause to believe an employee is mentally or physically unable to perform required duties" in order to require Smith to take an examination. Smith Dep., Ex. 10 Previous CBA, 11 Current CBA; Plaintiff Dep. 80-81. It is difficult to imagine that the City would have had actual, "reasonable cause" to infer that Smith was presently *mentally unable* to perform his required duties, and especially since Smith had participated in a lengthy arbitration process since then. Which he won.

A jury could find, under the aforementioned circumstances, and particularly with the City's delay in returning Smith, refusal to accept Dr. Quarry's opinions, and subsequent delay in returning Smith to work, that the City did not act reasonably and instead took these actions in retaliation of Smith in order to delay Smith's return to work.

The delay in returning Smith to work was materially adverse to Smith, and would potentially dissuade a reasonable worker from filing or pursuing a charge of discrimination, and reasonably did cause Smith to lose out on the possibility of obtaining a promotion to a Lieutenant position. Upon being notified of the arbitrator's decision to reinstate Smith, the City not only took action to unreasonably delay Smith's return, but also, while Smith was being delayed, the City suddenly began to promote several younger Officers to the position of Lieutenant within the department, as well as to hire younger outside Officers to fill Lieutenant positions, which the City did in July, after Smith won his arbitration and was reinstated via the arbitrator's June 8 decision and award. Therefore, the act of unreasonably delaying Smith's return, for pretextual reasons, gave the City a chance to promote and hire a number of younger Officers into positions at a higher level than Smith. These actions taken together could be seen by a factfinder as baseless, illegitimate, and motivated by unlawful retaliatory animus. As such, these factual issues preclude summary judgment.

Smith also disputes the City's second argument that Smith cannot show a causal connection between his protected activities and the fitness for duty examination as well as the City's hiring and promoting of several younger Officers to the Lieutenant position.  There can be no dispute that the City's ordering of the examination was directly connected to the events which occurred one year prior.

## III. CONCLUSION

As demonstrated above, Plaintiff identifies numerous issues of material fact rendering summary judgment inappropriate.  In Smith's arbitration proceeding, the Arbitrator carefully reviewed all of the testimony and evidence.  He also discussed in detail all of the facts and defenses involved in the proceeding, and concluded that the City had no justification for Smith's termination:

> Before addressing the remaining facts, it is fair to note that the City's conclusions on the Pursuit Policy were so unreasonable, and so outside what could be considered rational, that it colored all that followed.  It is not clear why the City took the action it did here, but there are indications that other motivations exist that are outside the scope of the undersigned's purview. What can be concluded is that the City could not sustain its burden of proving the central factual allegation against the Grievant [Smith], and the remainder of its case became suspect.

Exhibit A, at 55.  This same analysis demonstrates why genuine issues of material fact remain in this case and summary judgment should be denied.

Respectfully submitted,


*/s/ Matthew D. Stokely*
Matthew D. Stokely (0062971)
PICKREL, SCHAEFFER & EBELING CO., LPA
2700 Stratacache Tower
Dayton, Ohio 45423
T: (937) 223-1130 / F: (937) 223-0339
E: mstokely@pselaw.com
*Attorney for Mr. Smith*

30

## CERTIFICATE OF SERVICE

This certifies that a true and accurate copy of Plaintiff's Motion in Opposition to Defendant's Motion for Summary Judgment was filed and served upon Arthur P. Schoulties, Beverly A. Meyer, and Benjamin J. Reeb, Bricker Graydon, LLP, attorneys for Defendant, via the Court's electronic filing system this 16th day of November, 2023

*/s/ Matthew D. Stokely*
Matthew D. Stokely (0062971)
PICKREL, SCHAEFFER & EBELING CO., LPA